# The Alton Railway and Illuminating Co. v. Thomas L. Foulds, Adm'r.

1. ELECTRIC LIGHTS—*Duty of Persons Supplying.*—A person engaged in supplying for profit such a dangerous agency as electricity for lighting purposes, where the result of his negligence may be to expose others to serious injury or death, is chargeable with a high degree of care in delivering it.

2. QUESTION OF FACT—*As to Cause of Death.*—Where it is shown that a person came to her death by electricity, the question whether she met her death by a stroke of lightning coming from any place other than defendant's plant, and whether her death was caused by negligence, as well as the question whether she was exercising ordinary care at the time she was killed, were all questions of fact, to be found by the jury from all the evidence before them.

Action for Damages.—Death from negligent act. Trial in the Circuit Court of Madison County; the Hon. WILLIAM HARTZELL, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the August term, 1898. Affirmed. Opinion filed March 10, 1899.

**Statement of the Case.**—Appellee's dwelling house, except the basement, in the city of Alton, was wired and electric lamps placed therein by appellant, about June 1, 1896; and the basement was wired and one or more lamps installed therein by it two or three months later, and appellant furnished light for the house.

About six o'clock in the evening of September 26th of that year, appellee's wife, Ellen A., went down into the basement to turn on the light, so that the ice-man, who had preceded her, could see where to put the ice. Immediately on taking hold of the lamp, she received a shock and fell to the ground floor, and in falling came in contact with the iceman, who was standing close to her, and he also received a shock from the contact that knocked him down. As soon as he regained his feet, observing that she still held the lamp or wire, he tried to separate her from it, and was thrown away from her some distance. He got up and went to the ice wagon, about 200 feet distant, and informed

his companion of the occurrence, and he went to a Dr. White's house, about 300 feet from Dr. Fould's house, and informed people there of the accident, and Dr. White and both ice-men went to Dr. Fould's house. As Dr. White went into the cellar he saw electric sparks trickling along the cellar bottom and saw Mrs. Foulds lying on the bottom of the cellar, when he stooped down and moved her about six inches, and in doing so was knocked back to the cellar steps. Soon thereafter appellee, who had been at his barn, came, and on being informed of the situation and danger, he wrapped a piece of old carpet about the wire and succeeded in releasing it from his wife's grasp. From the time Mrs. Foulds took hold of the lamp to turn on the light, to the time when she was separated from it, from ten to fifteen minutes elapsed, and about this time the family physician arrived, but Mrs. Foulds was dead. An examination by the physician revealed a scar inside the right thumb and forefinger, and a burn some two or three inches in width extending down her back to her hips, so badly charred, that when touched it crumbled in his hands.

Appellee brought suit against appellant in action on the case for carelessly and negligently permitting its wires and conductors of the electric current, and other appurtenances connected therewith, used to furnish lamps and lights to plaintiff and his intestate, to become and remain out of repair and without proper and sufficient insulation, and the wires so uninsulated, to come in contact with trees, whereby the current escaped therefrom and became grounded and liable to be communicated to persons using said lamps; and in carelessly and negligently permitting its transformer and appurtenances used in furnishing such light to become and remain out of repair and without proper insulation, and by reason thereof said current passed through the body of plaintiff's intestate, causing her death, while she, in the exercise of ordinary care, was in the act of turning on a lamp in the basement or cellar of plaintiff's house.

A verdict and judgment was rendered in favor of plaintiff below for $3,500, and defendant has appealed to this court.

JOHN G. IRWIN and HENRY S. BAKER, attorneys for appellant.

The rule that negligence is a question of fact does not mean that a jury shall be left to their own fancies to determine what, in a particular case, is or is not negligence, or that they may set up a standard of their own, made for the purposes of the case on trial, and not previously followed or to be made a precedent in any case thereafter arising. It is the province of the court to define negligence, and for the jury to say whether a particular case falls within the definition given by the court. The one involves a question of law, the other a question of fact. G. W. R. R. Co. v. Haworth, 39 Ill. 106; Penn. Co. v. Conlan, 101 Ill. 106.

It is not necessary that the injury alleged shall be shown to have been so certain to result from the negligence charged that a reasonable person could have foreseen exactly what would happen in the particular case; it is enough if it be a consequence so natural and direct that a reasonable person might and naturally would see that it was liable to occur. C. & A. R. R. Co. v. Pennell, 110 Ill. 435.

TRAVOUS & WARNOCK, attorneys for appellee, contended that the furnishing of electricity for lighting and the means used therefor, were under the management and control of appellant. Death, in the ordinary course of things, does not result from the act of turning on an incandescent lamp, where those supplying the current use proper care. The rule *res ipsa loquitur* therefore applies, and the accident itself was *prima facie* evidence of appellant's negligence. N. Y. C. & St. L. R. R. Co. v. Blumenthal, 160 Ill. 40; Quill v. Empire S. T. & Telegraph Co., 92 Hun, 539; see valuable note on this subject in 3 Am. Neg. Rep. 488, etc.

And this rule is especially applicable to cases like the present. Larson v. Central Ry. Co., 56 Ill. App. 263; Trenton Passenger Ry. Co., etc., v. Cooper (N. J.), 37 Atlantic Rep. 731; Bahr v. Lombard, 53 N. J. L. 233; Clarke v. Nassau

Electric R. R. Co., 41 N. Y. Supp. 78; Jones v. Union R. R. Co., 46 N. Y. Supp. 321; Haynes v. Raleigh Gas Co., 114 N. C. 203; Illingsworth v. Boston Electric Light Co., 161 Mass. 583.

And imposed upon the defendant the burden of rebutting the specific negligence alleged.    North Chicago Street Railway Co. v. Cotton, 140 Ill. 486.

Appellant being engaged in supplying for profit a dangerous agency, and the result of negligence on its part being to expose persons to death or serious injury, it was chargeable with the highest degree of care.    McLaughlin v. Louisville E. L. Co., 5 Am. & Eng. C. Cases (N. S.), 167; Giraudi v. Electric Improvement Co., 107 Cal. 120; City Electric Ry. Co. v. Conery, 61 Ark. 381; Leavenworth Coal Co. v. Rachford, 48 Pac. Rep. 927; Denver Consolidated Electric Co. v. Simpson, 31 L. R. A. 566.

MR. JUSTICE BIGELOW delivered the opinion of the court.

At the close of the plaintiff's evidence in chief, the defendant below requested the court to instruct the jury to find for the defendant, but the court refused the request and the defendant excepted.    Counsel for appellant now insist that the court erred in its refusal to so instruct, and have filed an elaborate and able argument in support of their contention.

In the present state of the record, the question which we need light upon is, not whether the court erred in its ruling at the time it was made, but it is whether the error, if such it was, survived the entire trial of the case, and should now be disposed of in the same manner it might have been disposed of, had defendant introduced no evidence in defense, and plaintiff had not followed with rebutting evidence. We are referred to no authority sustaining such a contention, and since the request was renewed at the close of the entire evidence, we must hold that the ruling on the later request controls the former ruling, and that therefore we should only inquire into the correctness or incorrectness of the ruling on the later request.

At the close of the plaintiff's evidence in chief, it had been shown by evidence not afterward contradicted, that Mrs. Foulds was killed by an electrical current that passed over the wire, connected with which was the metal socket which she held in her hands; and it had also, by like evidence, been shown that the current continued its passage through her, until the socket or wire had been wrenched from her grasp by her husband, ten or fifteen minutes after she first took hold of it; but no specific evidence had been introduced tending to show how the increased voltage that caused her death got on the wire, further than that the primary wire between the transformer near Dr. Foulds' house and the electric light plant, had at times come in contact with the trees and burned them, and that such contact would make a ground, and this evidence also was not thereafter contradicted.

The defendant then introduced evidence tending to prove that its plant and appurtenances were of the best in use; that they were kept in good condition, and that insulators had been put on some of the trees that the primary wires came in contact with, and that its wires were daily tested for grounds, with other evidence tending to show that it was not negligent in maintaining and operating its entire system, and it also introduced testimony of several witnesses who testified that at or about the time of the accident an electrical storm was passing not far distant.

It then called a number of expert witnesses, who testified that, in their opinion, the death of Mrs. Foulds was caused by a static discharge of electricity, in consequence of the electric storm, and that it could be accounted for in no other way.

Plaintiff, in rebuttal, introduced several witnesses who contradicted defendant's witnesses in regard to the existence of an electric storm at the time of the accident.

The plaintiff then called A. L. McRey as a witness, and his testimony, as abstracted, was as follows:

"I live in St. Louis, and I am a consulting electrical engineer. I have been such since July 1, 1896. I gradu-

ated at the University of Georgia in 1881, and then entered the U. S. Signal Corps and had charge of the weather service. After that I was selected to make a study of atmospheric electricity, and I was sent to Harvard and put in four years there. After that I was assigned to the study of physics at several colleges, up to July, 1896, and I then entered upon my present profession. From the time I was at Harvard University, in all the teaching, I had charge of the electrical laboratories, where they made all the experiments which they get from the text books. I visited the house of Dr. Foulds on October 1, 1896, and I made an examination of the lines leading from State street down to the transformer. I found that the lines passed through a number of trees, and in one or two places the limbs of the trees had been burned by the wires, and tree insulators had afterward been put in on some of the places. At the time I made the examination there was one or more contacts on each of the two lines where the insulation had been worn off and the bare copper had come in contact with the limbs. I think the contact was sufficient to produce a ground. A ground is where the current from the wires leaks off by any means to the ground. It would simply mean there is a path there for the current to leave the wire and go down to the ground. I made an examination of the transformer and its surroundings at the same time; I did not examine the transformer; I simply applied the magnato bell to the wires on the outside of the transformer; the test showed that the wires leading to the house were clear; the magneto bell I had was made to ring at a resistance of 25,000 ohms, and my test showed that the circuit to the trees had an insulating resistance greater than 25,000 ohms; I mean the secondary wires. I further found that there was a slight ground on the primary wires leading through the trees to the transformer. At the time I made this test, there were with me Mr. Chittenden, Mr. Booth and Dr. Foulds. When I made the examination of the transformer I further found that the wires that lead out from the transformer were bare; the primary wires and the secondary wires were not in contact; there was plenty of room for them there, but they were liable to come in contact.

The top of the pole has a cross-arm on it, and the cross-arm has glass insulators and the wires coming from the line are fastened to the glass insulators and this goes down to the transformer, and the secondary wires coming out from the transformer go out to the cross-arm, and from there

over to the other side of the street and into the house. The transformer makers, in making these coils, leave about ten inches or a foot of the wire on the outside. They bring it to the outside of the transformer and leave about eight or ten inches of wire there, and those wires are connected on the light wires, and in making the connection, they have to scrape off the insulation, so as to get a connection between copper and copper, and after the connection is made, the best method is to wrap insulation prepared for that purpose around those points, but this was not done. There was enough wire there not insulated for them to come in contact, and if they had come in contact they would simply raise the voltage of the wires that go in through Dr. Foulds' house up to 2,000, and if Mrs. Foulds had touched this lamp having a ground on the street, she would get a voltage of either 1,900 or 2,100, according to the swinging of the alternating current. The primary wires are first wrapped around the insulators on the cross-arms and then hang down a little extra length before entering the transformer, and this is also true of the secondary wires on the other side of the transformer. They hang in a loose coil before fastening on the insulators on the cross-arms, and these wires hanging there are in such a position that they could come in contact. The insulation was off from all of the wires, both the secondary and the primary. The wet weather would have no effect whatever upon this, because if you have copper resting on the copper, the resistance is practically nothing. The wind would not have very much effect upon these wires in bringing them together. It might a little, but not very much. If this increased voltage from the primary wire had gone around the transformer by these two different wires, connecting it in the way that I have stated that they might, and got into the house, it would not have caused Mrs. Foulds' death if the primary wire had not been grounded in some way. I heard the testimony of Dr. Foulds and the other witnesses in regard to the accident and of the circumstances attending it, and my opinion is that the cause of the accident is, there was a connection outside of the transformer, so that these wires were connected, as I have stated might have been, and the voltage in Dr. Foulds' house was 2,000 on one wire and 1,900 or 2,100 on the other, the ground being on the primary wire out in these trees, and when Mrs. Foulds touched the lamp coming in contact with one end of the wire, and as she was standing on the ground that connected the circuit, she got the

voltage of 1,900 or 2,100, and was killed. I do not think the lightning could have produced this effect striking between the house and the transformer. It could not produce this effect of holding on. And one reason that I do not think the lightning struck beyond the transformer on the main line that grounded on the trees, is, that if the lightning had struck further down town it would have to pass the lightning arrester, and if it struck between the lightning arrester and the transformer, it would have to pass through several trees, and there were six trees between the State street line and the transformer with a number of contacts, so that it would have to pass all of these and it would have a tendency to ground. It seems to me that if the lightning had struck the wires, the path offered it down the trees is of much less resistance than the mica insulators between the two coils of the transformer, and therefore it would go to the ground by the trees. I have no interest whatever in this suit."

### Cross-examination:

"I merely say that there was a possibility of a contact between the primary and secondary wires at the transformer. I did not find any contact between the wires at that point when I made the test on October 1, 1896. I do not know whether there was a contact at the time of the accident or not. I do not pretend to know that. When I made this test I found a ground at certain trees. These trees began at State street, where the main line branches off. They were between the main line and the transformer. The ground caused by the contact with these trees would not of itself have caused the death of Mrs. Foulds."

### Re-direct Examination:

"The ground by way of the trees would not have caused the death of deceased by itself, nor could it have been caused by the defect in the transformer which permitted the increased voltage to pass through it, unless the ground had been there. It took the two combined to cause the death."

It is insisted by counsel for appellant that the evidence of Dr. McRey was improperly admitted in rebuttal. A complete answer to this contention is, that no exception was taken by appellant to the ruling of the court in admitting it, or any part of it and hence no question in regard to its admission is before us for review.

The quality of Dr. McRey's evidence is also attacked, and it is insisted that he based his opinion upon the opinion of other expert witnesses, whose testimony he had heard. This we think is a misconception. It is true that some of the facts on which his opinion was based, were testified to by himself, but this fact, instead of weakening his expert opinion would seem to strengthen it, especially since the facts to which he testified were not contradicted. Physicians are often called upon to give opinions upon facts known only to themselves, as well as upon facts partially known to themselves and the balance supplied by other witnesses.

The primary grounds on which a reversal of the judgment is sought are stated by counsel in the form of questions, which we will endeavor to answer, so far as they are already unanswered or waived. They are as follows:

" First. Does the declaration state a *prima facie* case?

Second. Did the evidence in chief for the plaintiff establish the truth of all the material averments of the declaration?

Third. Should the instruction to find not guilty have been given, either when the case was first submitted or at the conclusion of all the evidence?

Fourth. Was McRey's testimony admissible in rebuttal?

Fifth. Was it admissible at all under the averments of the declaration?

Sixth. As an expert, should he have been permitted to give his opinion on the whole case, and in rebuttal state how the death of Mrs. Foulds could be accounted for by the evidence?

Seventh. As an expert, should he have been permitted to give his opinion on a hypothetical case, involving the assumption of a contact between the primary wires and the trees, and a ground as a consequence of it, at the instant of the accident, and also contact between the ends of the primary and secondary wires at the transformer—neither of which were proved—and the last not having been so much as hinted at or suggested by any witnesses except McRey himself? "

It is alleged in the first count of the declaration that the defendant carelessly and negligently permitted its plant, wires and other conductors of the electric current, and appurtenances used in furnishing light to plaintiff, to

Alton Ry. & Illuminating Co. v. Foulds.

become and remain out of repair and without sufficient insulation, so that the current escaped and became grounded and liable to be communicated to persons using lamps. And that while deceased, with all due care and diligence, was in the act of turning on a lamp in the basement or cellar of the building, through the negligence of the defendant in permitting its plant, wires, conductors, and appliances used in supplying said current and light, to be out of repair and without insulation, the current became grounded and passed through her body, whereby she was killed.

The second count is the same as the first, except it omits any specific charge of negligence for want of proper insulation of the wires.

The third count alleges the negligence the same as in the first count, with the addition that the transformer and its appurtenances were allowed to become out of repair and without sufficient insulation.

The fourth count charges negligence in not properly wiring the basement of the building, and that by reason thereof, in some way to the plaintiff unknown, the electric current was liable to be communicated to persons using the lamps.

When appellant wired the basement or cellar of appellee's house, and agreed to furnish him light for hire, it well knew it was dealing in an element that, delivered in a current of high voltage, such as was carried on its primary wires, was almost certain to bring death to the person who turned on the lamp, if there was a ground of the current on the circuit; hence, the law imposes upon it the duty to exercise a high degree of care and skill in the delivery of the element it had contracted for.

If the injury itself furnishes a presumption of negligence so as to require the defendant to show, by evidence, that it has been guilty of no negligence that caused it, then it logically follows that all that is necessary to be averred in the declaration to entitle the plaintiff to recover for the injury is the agreement, a negligent breach of it, and the result; also that the plaintiff has not by any neglect on his part

contributed to the result.  There are many cases holding this rule.  See Barnowski v. Helson, 15 L. R. A. 33, and numerous cases cited in notes; see also I. C. R. R. Co. v. Phillips, 49 Ill. 234; P., P. & J. R. R. Co. v. Reynolds, 88 Ill. 418; Eagle Packet Co. v. Defries, 94 Ill. 598; N. Chi. Street Ry. Co. v. Cotton, 140 Ill. 486; N. Y. C. & St. L. R. R. Co. v. Blumenthal, 160 Ill. 40; Larson v. Central City R. R. Co., 56 Ill. App. 263; Iron R. R. Co. v. Walrath, 38 Ohio St. 461; R. R. Co. v. Moewry, 36 Ohio St. 418; Cooley on Torts, 663; 16 Am. & E. Ency. of Law, 448.

But it is not necessary to invoke the aid of the rule *res ipsa loquitur* to sustain the sufficiency of the declaration in this case.

As to the manner of pleading negligence, Mr. Thompson, in his work on Negligence, page 1247, says: " It is not necessary to set out the facts constituting the negligence complained of.  An allegation specifying the act constituting the injury and alleging that it was negligently or carelessly done, is sufficient."

We are unable to discover wherein the first and third counts of the declaration are defective, since if the injury was caused by a current of electricity, sent over the wires by appellant, the proximate cause of the injury was the lack of proper insulation of the wires.  It is true, there is no allegation in the declaration that the primary and secondary wires at the transformer came in contact with each other where the insulation was gone, but that was only a matter of evidence, and it is a rule of law well understood, that it is unnecessary to plead the evidence, as ultimate facts only need to be averred in good pleading.  Lavis v. Wis. Cent. R. R. Co., 54 Ill. App. 636; Chicago City Ry. Co. v. Jennings, 57 Ill. App. 376, 157 Ill. 274; Andrew v. C. & N. W. Ry. Co., 45 Ill. App. 269.

We are of the opinion that the first and third counts of the declaration each state a cause of action with sufficient certainty, and since, if one count only is good, that is all that is required, we answer the question in the affirmative.

Alton Ry. & Illuminating Co. v. Foulds.

As to the second question, we are of the opinion that it is immaterial whether plaintiff's evidence, introduced before the defendant introduced its evidence, established the truth of the averments of one or more of the counts of the declaration or not.   As the record stands, we can only be called upon to determine whether all of plaintiff's evidence that was given after defendant had introduced its evidence, as well as that given at the opening of the case, was sufficient to establish the truth of the averments of the declaration.

As to all of the remaining questions, except the third, we are of opinion that as no exception was taken to any ruling of the court in admitting the testimony of Dr. McRey, any attempted answer to the questions or either of them, would serve no useful purpose, and would be entirely out of place.

As to the third question, we have already stated, in substance at least, that when the defendant put in its evidence, and the plaintiff followed it by rebutting evidence, the only question for us to consider was, whether the court erred in refusing to give to the jury defendant's renewed instruction to find for the defendant.

This was but challenging the sufficiency of plaintiff's evidence to sustain the verdict.

Besides the evidence of Dr. McRey, two expert witnesses testified that a person killed by a static discharge of electricity does not remain in the condition Mrs. Foulds did, but can be handled with safety immediately after the stroke and there was no evidence to the contrary.   There was evidence of other witnesses besides Dr. McRey, that the insulation of the primary wires at the trees back of the transformer, had been worn off and that at times the trees had been on fire, but until Dr. McRey was called, no witness had testified that the primary and secondary wires at the transformer had been left without insulation at a place where they were liable to come in contact.

This evidence is not contradicted.   It is true no witness testified to having seen the wires in contact, but the circumstances were such that unless the deceased was killed

by a static discharge of lightning striking the secondary wire, her death could be accounted for in no other way than by the coming together of the two wires, and if they were not insulated the result must have been that the current from the primary wire passed over the secondary wire, attached to which was the lamp which the deceased had hold of, and if the current from the primary wire was grounded at the trees, it passed through her body, causing her death. Absolute certainty is neither required nor expected, before a fact can be said to be proven in a civil case. But when a result is seen and facts are proven that make the result highly probable therefrom, and the result can be explained in no other way, the probability of the existence of the facts from which only the result could flow, must be deemed to be proven.

The question whether deceased met her death by a stroke of lightning coming from any place other than appellant's plant, and the question whether her death was caused through the negligence of appellant, as well as the question whether she was exercising ordinary care at the time she was killed, were all questions of fact to be found by the jury from all the evidence before them; and it would have been error for the court to have instructed the jury at the close of the evidence to find for the defendant.

We have examined the evidence with great care, and are satisfied the jury have reached a conclusion fully warranted by it.

We find no error in the record, and the judgment is affirmed. Judgment affirmed.