## Jessie Frazier, Administratrix, Appellee, v. City of Geneva, Appellant.

### Gen. No. 6,238.

1. ELECTRICITY, § 8\*—*when city not obligated to inspect electric appliances inside house of customer receiving current.* A city operating an electric lighting plant is not required to make inspection of appliances connected with the system inside the house of a customer which are put there by such customer without notice to the city and over which the city has no control and in which it has no interest, and the city is liable in an action for damages for injuries occasioned by such appliances.

2. ELECTRICITY—*when city does not adopt wiring inside house of customer as part of its system of lighting.* Where a city operating an electric lighting plant required customers to bring their house wires a certain distance outside the house where it attached its wires to such house wires, *held* that the city did not, by so

\*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

attaching its wires to the house wires, adopt the wiring inside the house as part of its system of lighting.

3. ELECTRICITY, § 27*—*when evidence insufficient to show existence of excessive volume of electricity in wires in house of customer.* Evidence *held* insufficient to show that an excessive volume of electricity was in the electric lighting wire in the house of the deceased, in an action to recover damages for his death.

4. EVIDENCE, § 232*—*when coroner's verdict is competent evidence.* A coroner's verdict is competent evidence, although not filed with the clerk of the Circuit Court.

5. EVIDENCE, § 442*—*when opinion of physician as to cause of death is inadmissible.* The testimony of a physician giving his opinion as to the cause of a party's death, based in part upon what he was told by another party, but not stating what such other party had told him, *held* improperly admitted in an action to recover damages for such death.

6. NEGLIGENCE, § 228*—*when instruction limiting question of contributory negligence to the time of death is improper.* An instruction limiting the question of contributory negligence of deceased to the time of his death from contact with an electric appliance placed by him in his house without the knowledge of or notice to the city furnishing electricity for his house, *held* improper, in an action to recover damages for his death.

7. WITNESSES, § 187*—*when leading questions are improper.* Leading questions on examination in chief are, as a general rule, improper.

Appeal from the Circuit Court of Kane county; the Hon. CLINTON F. IRWIN, Judge, presiding. Heard in this court at the April term, 1916. Reversed and remanded. Opinion filed October 12, 1916.

ALDRICH & WORCESTER and LEONARD C. MEAD, for appellant.

RUSSELL & McNERNY, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

David Frazier died suddenly in the basement of his home in Geneva, Illinois, on the evening of July 8, 1913, and this suit was brought by his administratrix

for the benefit of the next of kin, upon allegations in the declaration that his death was due to the negligence of the City of Geneva in the control of its electric lighting plant. Plaintiff had a verdict and a judgment for $5,000, from which defendant appeals.

The city operated an electric lighting plant and supplied electricity to business houses and homes within the city and to the home of Frazier, situated on the north side of James street, between Third and Fourth streets. A severe wind, electrical and rainstorm passed over the city on the afternoon of July 8th, but abated about six o'clock in the evening. At some places in the city poles carrying the electric wires were broken down, and primary wires carrying 2,300 volts and secondary wires carrying 110 volts went down together. The poles and wires near the Frazier house were not broken down, but a pole in front of the Frazier residence, to which a guy wire was attached, had fire on the outside of it, and sparks were seen to come from the wires in front of his house. He reported this by telephone to an officer of the city in its electrical department and the latter inquired if the lights were burning all right in Frazier's house and received the answer that they were. Thereupon said officer paid no further attention to Frazier's house. The city received many notifications of trouble at various places, and did work at some of those places. The city officers testified that they received no notice that the wires were down a block and a half or two blocks from Frazier's house until after his death, but did receive notice that the wires were down at a place still more distant, and they did not make any repairs there at that time, and they left the works early in the evening. About nine o'clock Frazier carried a crate of fruit into the basement and his wife accompanied him. Part way down the stairs there was a button with which to turn on the lights in the basement.

There were two electric lights in the main room of the basement. One of these had been turned off at the socket so that it did not light when Frazier turned the button. The other one did light. In the fruit room an electric cord came down from the ceiling and there was a socket at its end several feet above the floor. The afternoon of the preceding day Mrs. Frazier had taken out that lamp and had inserted in the socket a fixture connected with a flat iron which she used that afternoon upon her ironing table in the basement. When she finished her ironing she detached that fixture from the socket, but she did not put back the lamp. She did not remember whether the current was shut off at the socket when she left it. When they reached the main basement Mrs. Frazier turned to one side for some other errand and Frazier passed into the fruit room, the door of which was open, and into which room shone the light that was burning in the basement. An instant later Mrs. Frazier heard a groan and went to the fruit room and found her husband lying on the floor. She testified that there was electricity in the air and she was thrown down and could not immediately get up or detach her hands from the floor. She found herself unable to move her husband and went and called a neighbor, and then telephoned her husband's physician, who came at once. Frazier was dead. He had a burn in the palm of his hand. The doctor testified in chief that it was half the size of the palm of the hand. Counsel say this was a mistake of the stenographer. On cross-examination the doctor said that it was three-fourths the size of a ten-cent piece. Another witness said it was a quarter of an inch in diameter; another one that it was as large as the head of a pin. Counsel for appellee have argued the case as if the testimony showed that it was a fresh burn. We do not find that any witness testified that it was fresh or that it had the appearance of being caused by electricity. If this was a fresh burn, caused by electric-

ity, then it is highly probable that when Frazier entered the fruit room he did not know that the lamp had been removed from the socket at the end of the cord, and that he then put up his hand to that socket for the purpose of turning on the light and then received the shock and fell and died. This cord in the fruit room and the socket thereon were not a part of the original wiring of the house, which had been done many years before, but was put in by Frazier, either personally or by some person whom he employed, and it was not shown that the city or any one connected with its electrical department knew of its existence. An employee of the city took off this socket soon after the death of Frazier and substituted a standard socket and produced in court the socket that was upon the cord when Frazier died; and the city proved that that was an improper and defective socket and that because of its defects a person placing his hand upon it could receive the shock of a short circuit. There was no evidence in denial of this testimony, so that the reasonable inference from this testimony is that if Frazier received the shock from the city's current it was through and because of a defective fixture that he had installed and of which the city had no notice.

Appellee contends that because of the dangerous character of electricity the city owed to all its customers and to Frazier, the duty of constantly inspecting the wires inside of houses and the fixtures, and to constantly keep them in proper repair, and this position is based upon *Alton Railway & Illuminating Co. v. Foulds*, 190 Ill. 367. That case should be read in connection with the report of the same case on the same record in 81 Ill. App. 322. In that case the defendant had wired the house and the basement and had installed the lamps, and the declaration so charged. Also, in that case the defect found to exist and which could have caused the death of the deceased in the

basement was a condition existing at the pole outside the house by which the high potential current on the primary wire could pass around the transformer and to the secondary wire, without passing through the transformer. The question here involved whether the seller of electricity is liable for a defective condition inside a house which it did not wire, for injury to the owner who did install it without the knowledge of the seller of the electricity, was not involved in that case, and is not there decided. This question was discussed in *Memphis Consol. Gas & Electric Co. v. Speers,* 113 Tenn. 83, where it was held that liability for an injury occasioned by a defect in a fixture of this kind depends upon the interest in or control over the defective appliance by the defendant which furnished the electricity, and that if it neither had interest in nor control over the appliance, then there would be no liability, and that the argument which would make an electric company an insurer against defects in appliances over which it had no control would, to avoid liability, impose upon it the duty of continued inspection of the wires of every customer supplied with its product, and that this would be a burden which no such company could bear and live, and would be a source of annoyance to its customers to which they would not long submit. That court therefore refused to follow the Kentucky case to the contrary (*Maysville Gas Co. v. Thomas, Adm'r,* 25 Ky. L. Rep. 403 (75 S. W. 1129), and held that there was no liability where there was no control over the wires and no knowledge of the defect that caused the injury. To the like effect is *Harter v. Colfax Electric Light & Power Co.,* 124 Iowa 500; and *Peters v. Lynchburg Light & Traction Co.,* 108 Va. 333. This subject is exhaustively considered and many authorities reviewed in *Minneapolis General Elec. Co. v. Cronon,* 166 Fed. 651. In that case the wiring in the building where the death occurred had been done by

the defendant, but that was some three years before, and the court said that there was no pretense that the work then done was improper or imperfect or that the fire resulted from any such cause, but that the occupant of the building had hung a suspended wire over a nail for so long a time that the insulation became broken and exposed the live wire to the inflammable wooden wall, but for which the fire would not have occurred, and that this was the direct fault of the occupant, over whose action defendant had no right of control. It was there contended for the plaintiff, as here, that as the defendant was manufacturing and furnishing to the building a highly dangerous force under its immediate control in the transmission, it was its duty to see that the inside wires were, at the instant, in such condition of repair and insulation as to prevent electricity from the exposed live wire to be conveyed to the building. The court reviewed the Kentucky case, which does so hold, and refused to follow it, and said:

"Its recognition and enforcement by the courts would impose upon the company furnishing electricity under a contract with the owner of a building who had wired it and owned and controlled the wires inside, an intolerable burden. * * * Can the company, unbidden, enter at will a private house of the citizen and pass into its various rooms to inspect these wires every day to see that they are in proper condition for the reception of the electricity it has contracted to sell? If so, it must employ a large retinue of competent men to do this work; and, as absolute insurers, under the rule contended for, the necessities of the situation would demand that they should have free access to these buildings at all times and under all conditions. Such a rule of law would tend to put concerns furnishing electricity to private houses out of business."

Among the cases there reviewed is *National Fire Ins. Co. v. Denver Consol. Elec. Co.*, 16 Colo. App. 86, to

which we have not access. That court is there quoted as saying:

"Where parties undertake to wire their own property and then apply to a light company to deliver a current to light the building, they must be assumed to take all risks resulting from the character of the wire which is put in the building and the method of construction which is adopted in putting it in. * * * We are quite ready to concede that, when an electric light company undertakes to supply a dangerous current to a dwelling house or to a building, they are bound to see that the wires they put in and the connections they make are properly insulated and protected, so that no harm will come to the property. Where, however, they are only employed to deliver the current by connection with wiring already made by the individual who owns the property, it seems to us that their responsibility ends when the connection is properly made under proper conditions, and they deliver the current in a manner which will protect both life and property."

We follow the principle announced in the foregoing cases and hold that no inspection of this wire in the fruit room was required of appellant by reason of anything thus far discussed. As to the electricity upon the floor, testified to by Mrs. Frazier, there is nothing in the evidence to justify the jury in finding that that electricity came from the wires of appellant. But appellee seeks to avoid the application of the foregoing authorities to this case by reason of one answer given by Peterson, superintendent of the electrical plant on cross-examination by counsel for appellee. The following occurred:

Q. "What is required by the City of Geneva in making its contract with the property owner, is that he shall bring his wires out for you to hitch on to?" A. "Yes, sir." Q. "And the city adopts that wiring as part of the means to carry the electrical current to the customer?" A. "Yes, sir." It is contended

that this answer proves that the wires inside of the house, including this cord and socket, put in the fruit room by Frazier without the knowledge of the city about a year before his death, became a part of the wires which the city was bound to inspect and keep in proper condition. We are of opinion no such conclusion can be drawn from that answer. The proof abundantly shows that the city did none of the wiring in this house, but that it required the house owner to bring his wires a certain distance outside of the house and the city attached its necessary wires to the house wires at that place. Of course, it is entirely true that the city sends its electricity into the house over the wires of the owner and that it is only by that method that its current can get to the lamps in the house. It cannot be held that the witness meant that the city thereby adopted the wires in the house as its own, or contracted to keep them in repair and duly inspected. In every building where the owner wires his own house and furnishes his own fixtures, the manufacturer of the electricity attaches its wires to the wires of the owner and the rule here contended for would make every manufacturer of electricity responsible for the inside wiring and lamps, and bound to inspection. No such consequence can follow the mere connecting of the wires outside of the building. The court therefore erred in modifying certain instructions so as to submit to the jury the question whether the city had adopted the wiring inside the house as part of its sys-- tem of lighting. There was no evidence to justify those modifications.

There are three other facts under which, in our judgment, the jury could not reasonably find that an excessive current of electricity reached deceased over the wire hanging in the fruit room. The light in the cellar which was lighted when deceased turned the button as he went down the stairs remained burning. There was a light burning in the back bedroom upstairs, and it

remained burning. The primary wire was arranged to carry 110 volts, which is not dangerous to life. There was a fuse in the attic where the wires first entered the house, which would melt and cut off all current from the building if it was loaded beyond 110 volts, and that fuse did not melt. As we understand the evidence the secondary wires did not come from the plant, but there were separate secondary wires for each transformer. On a pole near the corner of James and Fifth streets there was a transformer, the office of which was to take from the primary wire, which carried 2,300 volts, and transfer to the secondary wires 110 volts only, and those secondary wires led to four dwellings, including Frazier's, and those secondary wires did not enter any other houses or come near any other transformer. If, because of a storm or a stroke of lightning more than 110 volts had passed from the primary wire to the secondary wires, it would have destroyed or wrecked the transformer. This transformer was in perfect condition after Frazier died. We are therefore of opinion that under this evidence the jury could not reasonably find that Frazier died because of an excessive volume of electricity upon the wire in the house, and that the condition of other primary wires at other places could have no effect upon the primary wires running to these four houses. But it is said that Mrs. Sawyer, the occupant of one of these four houses, received a shock in her cellar the same evening from her electrical appliances. It was shown that this was from a cord put in by her husband and wound around some pipes in the basement and that, because of the storm and moisture in the air, these pipes became covered with moisture and the insulation of the wires became moist, and therefrom a current of electricity would pass to the floor and that when Mrs. Sawyer took hold of the fixture a slight current of electricity might pass through her body, producing the shock to which she testified. No such

condition was shown to exist in Frazier's case. The reasonable inference from the evidence is that Frazier received a shock because of the defective condition of the fixture which he had installed, and it is entirely possible from the evidence that he was not in physical condition to withstand a slight shock of electricity; and if there was electricity on the floor of the strength testified to by Mrs. Frazier, that came from some source not disclosed by this evidence, and may have assisted in producing Frazier's death.

The court admitted in evidence the coroner's verdict, which attributed the death of Frazier to being accidentally electrocuted in the basement of his home. Appellant contends that this was incompetent because it was produced by the man who was coroner when this death occurred, and that it had not been filed in the Circuit Court. It is contended that it does not become competent evidence until it has been filed with the clerk of the Circuit Court, and some of the earlier cases base its competency on the fact that it is a record of the Circuit Court. *Stollery v. Cicero & Proviso St. Ry. Co.*, 243 Ill. 290, was a case where such a verdict was introduced over the specific objection, set out in the opinion, that it was not shown to have been filed with the circuit clerk. The court did not discuss that objection, but in effect overruled it by holding that the verdict was properly admitted in evidence. That is decisive of the same question here.

Dr. Scott, a witness for plaintiff, gave his opinion as to the cause of death, based in part upon what Mrs. Frazier told him. The court refused to exclude that answer. He did not testify what Mrs. Frazier told him and the jury therefore had no means of knowing the basis of his opinion, and the answer should have been excluded. A hypothetical question could have been put involving what Mrs. Frazier testified to, and we are not called upon to decide whether in any other

way his opinion based upon her statements could have been made competent.

The court by instructions limited the question of contributory negligence of Frazier to the time of his death. It was the contention of appellant that he was guilty of negligence contributing to his death in installing this defective fixture in the fruit room. For that reason the limitation in the instruction was improper.

Counsel for appellee put many leading questions to his witnesses on examination in chief, over the objections of appellant. Why the court overruled these objections does not appear. The general rule prevailing in this country forbids leading questions on examination in chief. Jones on Evidence (2nd Ed.) 816; *Cannon v. People,* 141 Ill. 270; *Flynn v. Fogarty,* 106 Ill. 263; *Coon v. People,* 99 Ill. 368. There are exceptions to this rule, but no reason for departing from the general rule appears here. We mention this to prevent a like course at another trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*