## DIERKS LUMBER & COAL CO. v. BROWN.

Circuit Court of Appeals, Eighth Circuit.
May 9, 1927.

No. 7562.

**1. Negligence ⬡121(2)—Doctrine of "res ipsa loquitur" raises rebuttal presumption of negligence.**

The doctrine of "res ipsa loquitur" raises a rebuttable fact presumption of negligence, arising because the circumstances surrounding the accident are such that, unless an explanation be given, the only reasonable conclusion is that the accident was due to omission of defendant's duty.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Res Ipsa Loquitur.]

**2. Negligence ⬡121(2)—Rule of res ipsa loquitur does not relieve plaintiff from burden of showing negligence.**

Rule of res ipsa loquitur does not relieve plaintiff from burden of showing negligence or shift the burden of proof, although presumption arising from the circumstances under the rule may be sufficient to take the case to the jury.

**3. Electricity ⬡19(6)—Evidence of excessive current, injuring person, would take case to jury, in absence of evidence against presumption of power company's negligence.**

Evidence that current of electricity of high voltage, unnecessary, unsafe, and unsuitable, passed into store over defendant power company's wires, and plaintiff suffered injury therefrom, would be sufficient to take case to the jury, in absence of facts or circumstances to disprove the presumption of negligence.

**4. Electricity ⬡14(1)—Power company is not insurer of safety of those rightfully using current.**

Power and light company is not an insurer of the safety of those who rightfully use the current conducted over its wires.

**5. Electricity ⬡14(1)—Power company must use high degree of care in conveyance of current.**

Power and light company is required to use a high degree of care in erection, maintenance,

operation, and inspection of its plant and apparatus and in conveyance of current, to protect those likely to come in contact therewith, commensurate with the dangerous character of the business and consistent with the practical operation thereof.

**6. Electricity ⬯⟹19(3)—Power company may refute presumption of negligence from injury from excessive current by proving nonexistence, recency, or uncontrollable cause of defect in appliances.**

Power company may refute inference of negligence arising from fact of injury from excessive current at sewing machine by proof of non-existence, recency, or uncontrollable cause of defect in appliances.

**7. Electricity ⬯⟹19(6)—Evidence of power company's negligence from fact of injury by electric current at sewing machine held insufficient for jury.**

Evidence that defect, if any, in appliances of power company had existed less than an hour, and that alleged injuries to plaintiff from shock in turning on current at sewing machine were trivial, *held* to refute inference of negligence arising from fact of injury, and not to justify submission of case to jury, in absence of proof of specific negligence.

**8. Electricity ⬯⟹16(5)—Power company has reasonable time to discover and repair broken wire before it would be liable for injury from excessive current.**

Power company is entitled to reasonable time to discover and repair broken wire before it would be liable for injuries, from excessive current caused thereby, to one rightfully using the current.

**9. Electricity ⬯⟹19(10)—"Reasonable time" for power company to discover and repair broken wire is jury question, if facts or inferences are disputed.**

What is a "reasonable time" for power company to discover and repair broken wire, before it would be liable for injuries from excessive current caused thereby to one rightfully using current, is a jury question, if the facts or reasonable inferences therefrom are disputed.

[Ed. Note.—For other definitions, see Words and Phrases, First, and Second Series, Reasonable Time.]

**10. Electricity ⬯⟹19(10)—"Reasonable time" for power company to discover and repair broken wire is question of law, if facts and inferences are undisputed.**

What is a "reasonable time" for a power company to discover and repair a broken wire before it would be liable for injury from excessive current caused thereby to one rightfully using the current may be a question of law, if the facts and reasonable inferences therefrom are not disputed.

**11. Evidence ⬯⟹14—That shocks may be received from nondefective electric appliances is matter of common knowledge.**

It is a matter of common knowledge that there are shocks sometimes received from electric appliances in good order.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Action by Ozella Brown against the Dierks Lumber & Coal Company, commenced in the circuit court of Howard county, Ark., and removed to the District Court of the United States for the Western District of Arkansas. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Abe Collins and J. S. Lake, both of De Queen, Ark. (Lake, Lake & Carlton, of De Queen, Ark., and John S. Kirkpatrick, of Kansas City, Mo., on the brief), for plaintiff in error.

Paul Jones, Jr., of Texarkana, Ark. (W. P. Feazel, of Nashville, Ark., and H. P. Epperson, of Dierks, Ark., on the brief), for defendant in error.

Before STONE and KENYON, Circuit Judges, and POLLOCK, District Judge.

KENYON, Circuit Judge. Defendant in error was plaintiff, and plaintiff in error was defendant, in the trial court. The parties will be so designated here.

The action was commenced in the state court of Arkansas and removed to the federal court. The original complaint charged that plaintiff was injured, while in her father's store in the town of Dierks, by reason of a shock from an excessive current of electricity when she attempted to turn on the same for the purpose of operating a sewing machine, and that defendant was negligent in operating its lighting plant, in "that it had negligently permitted its transformer to get out of repair to the extent that it failed to function properly, and because thereof an excessive voltage of electricity was permitted to come onto the electric wire that she was using in operating the sewing machine in the building aforesaid; second, the defendant was further negligent in permitting its wires to become crossed and thereby let onto the light wire entering the building in which she was at work an excessive voltage of electricity, which excessive voltage of electricity caused the (shock) and injuries herein complained of."

Plaintiff, after the case was in the United States District Court, amended her complaint by alleging that defendant was negligent in permitting its wires, which supplied electricity used by plaintiff in the operation of her sewing machine, to become grounded, and in permitting other defects to arise and exist in its wires, apparatus, appliances and machin-

ery, which were to the plaintiff unknown. To this defendant filed a special demurrer and motion to make the amendment to the complaint more definite and certain. The court sustained the motion and plaintiff then filed an amended complaint, alleging "that said injuries resulted directly from an overcharge of electricity passing through the wires of defendant leading and extending into the building through which the current was supplied for the operation of the sewing machine, because of defects in said electric system owned and operated by defendant and under its exclusive management and control, which defects are and were unknown to plaintiff, and of which she has not been able to obtain any definite information; that said acts of negligence herein stated were the direct and proximate cause of plaintiff's injuries herein set out; that because of her said injuries she has been damaged in the sum of $25,000." To this defendant filed answer. Later plaintiff filed a second amended complaint, alleging that an excessive current of electricity passed from defendant's wire leading into the building through which the current was supplied for the operation of plaintiff's sewing machine, which current passed through plaintiff's body because of defects in said electric system, attachments, and appliances owned and operated by defendant, and under its exclusive management and control, and that these defects were unknown to plaintiff, and that she could not after diligent effort obtain any definite information with relation thereto. No specific negligence was alleged.

We have referred rather specifically to these numerous pleadings, as reference may hereafter be made thereto. The jury returned a verdict for plaintiff for $2,500. From judgment entered thereon this writ of error is prosecuted.

Defendant contends that the trial court erred in invoking the doctrine of res ipsa loquitur in its charge to the jury; in permitting plaintiff to attempt to prove specific negligence; in refusing instructions asked; in denying the motion of defendant at the close of all the testimony for a directed verdict. We limit our consideration to the last proposition, viz.: Was there sufficient evidence of negligence on the part of defendant to sustain a verdict for plaintiff?

The action is one based on negligence. Plaintiff could recover only upon the theory of defendant's negligence. While an attempt was made to prove specific negligence by showing there was a broken wire outside of the building where plaintiff was hurt, the case was tried on the theory that the negligence of defendant was not known, and that the doctrine of res ipsa loquitur applied. If plaintiff was a trespasser at the time of the injury and had no right to the use of the electricity to operate the sewing machine, as claimed by defendant, the doctrine of res ipsa loquitur would of course not apply. However, for the purpose of this opinion we pretermit that and other questions, and consider the case as one where a duty was owing to plaintiff on the part of defendant, and the circumstances as warranting application of the doctrine of res ipsa loquitur. Some general observations on that subject are made in Sweeney v. Erving, 228 U. S. 233, 238, 239, 240, 33 S. Ct. 416, 417 (57 L. Ed. 815, Ann. Cas. 1914D, 905), where the court says: "The general rule in actions of negligence is that the mere proof of an 'accident' (using the word in the loose and popular sense) does not raise any presumption of negligence; but in the application of this rule it is recognized that there is a class of cases where the circumstances of the occurrence that has caused the injury are of a character to give ground for a reasonable inference that if due care had been employed, by the party charged with care in the premises, the thing that happened amiss would not have happened. In such cases it is said, 'res ipsa loquitur,' the thing speaks for itself; that is to say, if there is nothing to explain or rebut the inference that arises from the way in which the thing happened, it may fairly be found to have been occasioned by negligence. * * * In our opinion 'res ipsa loquitur' means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

In Transportation Co. v. Downer, 11 Wall. 129, 134 (20 L. Ed. 160) the Court said: "A presumption of negligence from the simple occurrence of an accident seldom arises, except where the accident proceeds from an act of such a character that, when due care is taken in its performance, no injury ordinarily ensues from it in similar cas-

es, or where it is caused by the mismanagement or misconstruction of a thing over which the defendant has immediate control, and for the management or construction of which he is responsible."

[1] The doctrine of res ipsa loquitur raises a rebuttable fact presumption of negligence. The "thing itself speaks," but, as said in Francey v. Rutland R. R. Co., 222 N. Y. 482, 119 N. E. 86: "This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that unless an explanation be given the only fair and reasonable conclusion is that the accident was due to some omission of defendant's duty."

[2, 3] This rule does not relieve the plaintiff from the burden of showing negligence, and does not shift the burden of proof in the case. The presumption arising from the circumstances may be sufficient to take the case to the jury, unless the entire evidence is such that the presumption cannot stand against it. If no further evidence appeared in this case than circumstances showing that an excessive current of electricity of high voltage unnecessary, unsafe and unsuitable for the purposes of the store was transmitted over defendant's wires into the store and that plaintiff suffered injury therefrom, such circumstances would point to negligence and be sufficient, no facts or circumstances being shown to disprove the same, to take the case to the jury. As the Supreme Court said in the Sweeney Case, supra: "The circumstances are evidence of negligence." Central R. Co. v. Peluso (C. C. A.) 286 F. 661.

[4, 5] The defendant in carrying on the business of selling and conveying over its wires a dangerous electric current, while not an insurer of the safety of those who might rightfully use the same, was required to exercise a high degree of care to protect those likely to come in contact therewith commensurate with the dangerous character of, and consistent with the practical operation of, the business. That duty extended not only to the erection, maintenance and operation of its plant and apparatus, but likewise to inspection thereof to discover defects. Perhaps as strong a language on this subject as is to be found anywhere is the language of this court in Union Light, Heat & Power Co. v. Arntson, 157 F. 540, 541, 542: "Defendant owed a duty to its patron, Stone, to exercise a proper degree of care to prevent a dangerous current of electricity from entering his dwelling. This duty on the plainest principles of law and common sense extended to his family, his servants, his employés, and others who might rightfully be upon his premises. The current was a subtle and dangerous agent, and when uncontrolled was such as might be fatal to any occupant of a building in which it might be installed." In Memphis Consolidated Gas & Electric Co. v. Letson (C. C. A.) 135 F. 969, 972, the court said: "A company which, for purposes of gain, creates or carries a deadly current, must take care of it, and if it gets away because the wires are out of order, and enters a residence and kills a customer without any fault on his part, negligence is presumed, and the company is bound to exculpate itself."

As expressed in 20 C. J. p. 381, § 63: "The facts that defendant conducts electricity to a certain place; that electricity so employed may escape in such a way as to produce an injury; and that an injury from electricity is actually occasioned in a place where the injured party has a right to be are usually held to constitute a prima facie case of negligence."

A case relied on by plaintiff is San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 98, 32 S. Ct. 399, 401 (56 L. Ed. 680). There deceased had been killed by an electric shock received while adjusting an incandescent light in his home. The court, referring to the doctrine of res ipsa loquitur, said: "When so read it rightly declared and applied the doctrine of res ipsa loquitur, which is, when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." That case differs from this in that immediately after the injury to decedent both converters were found to be out of order, one being heated and its insulation charred, and the protecting ground wire of the other being broken or severed. Two neighbors also received severe shocks at the same time.

Among the cases bearing on this subject we cite Alton Railway & Illuminating Co. v. Foulds, 81 Ill. App. 322; Smith's Adm'x v. Middlesboro Electric Co., 164 Ky. 46, 174 S. W. 773, Ann. Cas. 1917A, 1164; Hebert v. Lake Charles Ice, Light & Waterworks Co., Ltd., 111 La. 522, 35 So. 731, 64 L. R. A. 101, 100 Am. St. Rep. 505; Cassady v. Old Colony Street Ry. Co., 184 Mass. 156, 68 N. E. 10, 63 L. R. A. 285; Arkansas Light & Power Co. v. Jackson, 166 Ark. 633, 267 S.

W. 359; Minneapolis General Electric Co. v. Cronon (C. C. A.) 166 F. 651, 20 L. R. A. (N. S.) 816; Colusa Parrot Mining & Smelting Co. v. Monahan (C. C. A.) 162 F. 276; Paine v. Cumberland Telephone & Telegraph Co. (C. C. A.) 249 F. 477; Central R. Co. of New Jersey v. Peluso (C. C. A.) 286 F. 661, 663; Runyan v. Kanawha Water & L. Co., 68 W. Va. 609, 71 S. E. 259, 35 L. R. A. (N. S.) 430; Denver Consol. Electric Co. v. Walters, 39 Colo. 301, 89 P. 815; North Memphis Sav. Bank v. Union Bridge & Construction Co. et al., 138 Tenn. 161, 196 S. W. 492. Many others are collected in extended notes to Walter v. Baltimore Electric Co., and Western Coal & Mining Co. v. Garner, 22 L. R. A. (N. S.) 1178 and 1183.

[6] The inferences of negligence that may arise from the unusual circumstances of an accident where the exact cause thereof is not shown may of course be refuted by the evidence introduced in the case. Assuming as we do that the doctrine of res ipsa loquitur applies in this case, hence that a prima facie case of negligence was established, defendant could exculpate itself by showing there was no defect in its appliances, or that if there was it was caused by circumstances beyond its control, or had existed for so short a period of time that it could not reasonably be expected to have been advised of it. 9 R. C. L. p. 1223, § 30. Does the evidence furnish such exculpation or is there absence of explanation? The ultimate question here is, when all the evidence was in had plaintiff made such a case of negligence as to warrant a jury in returning a verdict for her?

[7] This leads us to consider the state of the evidence when the motion for instructed verdict was made. Plaintiff testified that she and her sister were carrying on a sewing business and running their father's store in the town of Dierks. The store was in the brick building in which the post office was located, there being an office between. These two sisters had an electric sewing machine, which they connected by a cord to a socket in one of the drop lights. On the morning of May 15 or 16, 1924, plaintiff was engaged in making a dress for a customer. She and her sister had been using the electric machine that morning, and she turned off the electricity to wait on a customer. After serving the customer, she attempted to turn on the current, and claims she received a severe shock, throwing her against the counter, and that she was unconscious for about 15 minutes. After that she was dizzy and had a feeling of numbness in her right side; that as a result thereof she lost in weight, was sleepless, suffered pain, and claims injury to one eye. There was no outcry made at the time of her alleged injury; no help called for. Her sister went to an adjacent store and phoned the office of Dr. Colb. He was not there. Later, she and her sister testify, they went to the office of Dr. Colb.

Plaintiff's sister, Idella, testified as to the circumstances of the alleged injury; that they first started the sewing machine about 8 o'clock in the morning; that her sister sewed something like an hour or two; that her sister had turned off the current and was waiting on a customer; that Idella started across the store and was about 10 or 15 feet from her sister when she saw her attempt to turn on the current and fall against the counter; that they had never had any trouble with the sewing machine or electric appliance operating the same at any other time; that it was less than an hour after they were operating the sewing machine to the time her sister undertook to turn the current on again and was injured; that there was nothing wrong with the machine or the current that morning up to the time her sister turned it off to wait on a customer; that at about 1:30 o'clock of the same day she went to the post office, which was in front of the same building where they had their shop. She met her brother there, and as she stood there with him she noticed a broken wire on the line of the company's string of wires; that the wire was broken about 8 feet from one of the posts on which the wires were strung about 20 or 30 feet from the corner of the post office, and that one end of the wire had fallen down, and the other end had fallen over the wires going into the store, and that she thought it was one of the larger wires that was broken.

Her brother testified to practically the same thing, namely, that a wire was broken about 8 feet on the other side of the post and was lying across the other wires, and the end was lying on the ground on the edge of the alley; that this was on the same side of the street as the post office.

[8-10] If a jury could be permitted to guess and speculate in the absence of evidence thereof that the broken wire caused the excessive current, the fact remains that the wire must have been broken within an hour of the time plaintiff claims to have been hurt, as the sewing machine was being operated without any excessive current up to that time. The defendant was entitled to a reasonable time to discover and repair the broken wire. What is "a reasonable time" is dependent on the circumstances of each particular case. If

the facts, or the reasonable inferences to be drawn therefrom, are in dispute it is a question for the jury. Chesapeake Ins. Co. v. Stark, 6 Cranch, 268, 3 L. Ed. 220; Hamilton et al. v. Phœnix Ins. Co. of Hartford (C. C. A.) 61 F. 379. It may, however, be a question of law if the facts and the reasonable inferences to be drawn therefrom are not in dispute. Elliott on Contracts, vol. 2, § 1550; Pickel v. Phenix Ins. Co., 119 Ind. 291, 21 N. E. 898; Keller v. Hasley et al., 130 App. Div. 598, 115 N. Y. S. 564. It would seem that such break in the wire, if it occurred, was so near the time of the alleged accident as to repel under all the circumstances here disclosed any inference of negligence on the part of defendant in failing to discover and repair the same. Nothing appears in the record to show that the wires were old or worn or likely by depreciation to break. On the contrary, it appears that they were used continuously thereafter and were in good condition.

In John E. Richey, etc., v. Jerseyville Illuminating Co., 176 Ill. App. 495, 498, the court considered the question of notice and lapse of time. There the broken wire had existed for a much longer period of time than in this case. The question was whether or not by the exercise of reasonable diligence the company might have known of this defect. The court said: "We are inclined to the opinion that the exercise of the highest degree of care would not require appellants to search the remotest points of their line and wires every day to discover their condition." See, also, Denver Consol. Electric Co. v. Lawrence, 31 Colo. 301, 73 P. 39; Mitchell v. Charleston Light & Power Co., 45 S. C. 146, 22 S. E. 767, 31 L. R. A. 577; Grossheim et al. v. Pittsburgh & Allegheny Telephone Co., 255 Pa. 382, 100 A. 126; Scarpelli et al. v. Washington Water Power Co., 63 Wash. 18, 114 P. 870; Murphy v. Great Northern Ry. Co., 68 Minn. 526, 71 N. W. 662. The claim of a broken wire was not made until a former trial of the case. The purpose of its introduction was obviously to rebut defendant's claim of freedom from negligence. Plaintiff says in her brief: "Appellee does not say the crossing of the wires caused her injury: she says the wires were crossed and leaves that incident with the jury as a factor—but not the sole factor—to be weighed by them when they come to apply the doctrine upon which her case is founded."

The place of the alleged break in the wire was near the pole adjacent to the post office building and on the same side of the street where people passed in going to and from the post office, and the testimony shows an average of some 300 people at that time of day passed in and out of the post office within a space of two or three hours. No one else saw any broken wire, so far as this record discloses. Many witnesses testified that there was no such break, and defendant proved that it made no repairs of any break in said wires since April 3, 1924, when there were some breaks north of the pole at the post office corner, due to a storm. The evidence shows that after some break in the wires about April 3, 1924, they were repaired, and the lines and apparatus were in the same condition some months afterwards when experiments were made by witnesses Clarkson, Patterson, and Olney, as they were in May, 1924. It was also shown in the evidence that at least weekly inspections were made of the lines; that a neutral grounded system was maintained for the protection of property and of life, and that it was in perfect order and functioning properly; that tests were made of the transformers and they were in good condition. Experts testified that the system adopted by the company was the safest and most approved for the protection of life and property. The evidence shows that the condition of the transformers, the wires, the grounded system, and the entire lighting apparatus remained the same from the time of the alleged accident up to the time of the tests. Witness Patterson, who was connected with defendant, and who was an electrical engineer with broad experience, testified that the grounded neutral system was in good condition at the time of the tests. Witness Olney, an expert, testified that the common and accepted tests were applied and that the grounded system was in safe condition for use. Witness Clarkson, also an expert, who was in the employ of defendant, testified as to the tests made to determine whether the system was properly functioning. Tests were made at different times. It also appears from the evidence that there were house fuses provided by the owner of the building, and that they were in proper condition and would have been blown out by an excessive current, and no such current could then have passed into the building.

An answer to all this is, of course, that if plaintiff received such injuries as she pleaded, viz. that "she was horribly and frightfully shocked and injured by an excessive voltage of the electricity," and that the current of electricity passed along defendant's wires into the plaintiff's body, "thereby knocking her several feet and rendering her unconscious, in which condition she remained for about 30 minutes, that when she recovered conscious-

ness it was discovered that her right eye was almost totally destroyed, and her right limb and muscles became partially paralyzed and refused to function, and has remained so since," that there must have been something out of order with defendant's appliances. If the evidence substantiated these claims of severe injury, it would tend, of course, to show that there must have been defects in defendant's system of conveying the current to the building. If the injury was slight, it would minimize such defects. The evidence shows no such injuries as were claimed to have been suffered by plaintiff. She seems to have been examined by a large number of doctors. Only two were introduced to testify for her. One, Dr. Lanier, found inflammation of the retinæ, marked in the right eye and slight in the left, and testified there was some reduction in vision, and that the condition of her right eye might be due to an electric shock. The other medical witness for plaintiff, Dr. Beck, testified entirely from subjective symptoms. He had made four examinations at intervals covering a period of practically two years. From the record of his cross-examination we quote:

"Q. * * * Now then from those examinations, both subjective and objective, what is your conclusion with respect to her ailment, if an ailment, or her condition? A. I think she is a neurotic, Mr. Lake.

"Q. Tell that jury what you meant by neurotic? A. I think this girl is suffering with a list of neurotic symptoms, just like I attempted to describe for Mr. Jones a minute ago, resulting from this or some other cause. I don't know anything about the cause, except as she states it. I think she is suffering from a list of symptoms such as I have described, resulting from this shock, or whatever it is.

"Q. Neurosis is nothing more than a condition of the nerves? A. Condition of the nerves.

"Q. Now, the nervous condition of which you have testified is largely a condition of the mind, isn't it? A. I believe, sir, that it is an impression made on the brain and that affects the nervous system. That, I believe, answers your question."

He testified, too, there was some slight difference in the size of the girl's right leg and left leg, and in reference to the difference in size said:

"A. I think I understand you now. The only thing I see in that case, two things; first, it shows nerves, and that trouble as she saw it was applied to that side, and she did not give that leg the use that she did the oth-

er. That is what I think is true. I don't intend to say positively, but I think due to two things, the right side is the one affected in her mind at least, and she did not use it as much.

"Q. With the same exercise of that limb, you see no reason why there should have been an appreciable reduction? A. Well, no, I don't, except she had it in her mind that that leg was part of her lesion and she suffered from that leg.

"Q. The mind dwelling on that naturally caused her to— A. Necessarily so; yes, sir."

Doctors introduced by defendant, some of whom had been consulted by plaintiff (privilege being waived), testified there was nothing the matter with plaintiff; Dr. Hawley testifying that the condition of her eye must have been congenital. Dr. Mann, who examined her eyes, testified he did not see anything which indicated any injury from an electric shock. The girl had been sent to him by Dr. Archer, of De Queen, Ark. Dr. Archer, to whom plaintiff went for examination, did not testify. Dr. Hunt testified that, when plaintiff was off her guard, there was no difficulty in flexing the right foot; that the reflexes were all normal, the limbs normal size; that the right was a little larger than the left, but that that would be true in a right-handed person. Dr. Hopkins, who was called in by Dr. Archer to assist in the examination of plaintiff, and who kept her in the hospital at De Queen for three or four days for observation, testified:

"A. It was August 31, 1924, is when she was admitted to the hospital, and she was complaining of, I think, some vague pains in her body, and just a small impairment of the hearing and sight. I don't remember all the things she really did complain of, but now I am not an eye specialist; I don't know anything about the eyes, only her reflexes were normal in her eyes, and her hearing seems to be good.

"Q. Explain what you mean by reflexes in eye being normal. A. They will respond to light; the pupil will contract and dilate according to the light.

"Q. All right; go ahead. A. Her knee reflexes were practically normal, if she wasn't on her guard. Sometimes all of her symptoms would not come out like they ought to, but catch her off her guard and they all seemed to come all right. * * *

"Q. Now, after making these examinations, as you state, did you advise her of what you found and the conclusions you reached? A. Yes, sir; I called—they lived at Dierks,

and I called her father and one of her attorneys, Mr. Epperson, over to De Queen, and I took them in her room, and told them the results of my examination, and told them I couldn't find anything wrong with her, and to take her home.

"Q. That statement was made to her, in her presence, and in the presence of her father and Mr. Epperson? A. Yes, sir; .the three, I carried them into her room to talk to them."

Dr. Colb testifies that plaintiff did not come to him the day she claims she received the shock. All of the witnesses (except one, Mr. Curtis) who testified for plaintiff, who were examined on the question, testify that plaintiff, with the rubber inner soles in her shoes, could not have received any such shock as she testified to, if the complete voltage of the primary wire had passed over to the secondary wire and entered the house. The primary wire carried 2,300 volts, and the secondary wires 220 and 110.

[11] No one can read this evidence, it seems to us, and believe that plaintiff suffered any such injuries as she claims in any of her numerous petitions, or in her evidence. Consequently the argument that the shock to her shows the electric appliances under defendant's control must have been out of order is much weakened. It is a matter of common knowledge that there are shocks sometimes from electric appliances in good order, and undoubtedly plaintiff did receive some slight shock. We are satisfied, from a careful study of this evidence, without further referring to it specifically, that the injury to plaintiff, if any, was of a trivial nature, which has been magnified in the pleadings and in the testimony. As we have before said, defendant was not an insurer of the safety of those who might use the electric current. It was under a duty to exercise a high degree of care, taking into consideration the dangerous character of the business, to protect those who might rightfully come in contact with its appliances.

As the evidence stood at the close of the case, it showed conclusively that, if there was any defect sufficient to cause an excessive current of electricity to pass over the wires, that defect occurred within less than an hour from the time of the accident. The testimony also, in our judgment, fairly shows that there was no defect in the wires, in the grounded system, in the transformer, or otherwise on the day of the alleged accident. It would seem that the explanation of defendant is sufficient to show that the alleged injury did not occur from want of due care on its part, and the

inferences of negligence raised by the application of the doctrine of res ipsa loquitur are refuted. It is doubtful, in view of the showing by plaintiff herself that within one hour of the accident no defect existed in the system, whether such evidence did not destroy the applicability of the doctrine res ipsa loquitur to this case. In any event that was not sufficient time, in our judgment, under the circumstances disclosed, to warrant a finding of negligence on the part of defendant in failing to discover and repair the broken wire, assuming that it was broken, or to discover other defects if they existed.

Outside of other questions, this is determinative of the case. Circumstances might be so unusual that failure to inspect wires or apparatus of an electric company within an hour before an accident would be negligence, but such circumstances are not presented here. Of course, fact questions are for the jury. Likewise the credibility of witnesses. We have indicated our view of certain fact questions, merely as they bear on the general issues involved. Whether there is sufficient evidence to warrant the submission of a case to the jury is a question for the court. We conclude the evidence was not sufficient. The motion to instruct a verdict for defendant, made at the close of all the evidence, should have been sustained.

The judgment is reversed, and the case remanded for further proceedings in harmony with this opinion.

Reversed.