*523 Statement of the Case.
NICIIOLLS, C. J.
The plaintiff, in her own behalf, as widow of Rosalie Hebert, and as tutrix of their minor child, seeks to obtain judgment against the defendant for $2(1,031 as damages to herself and to her said child arising from the death of her deceased husband, Rosalie Hebert, occasioned, it is charged, by the fault of the defendant corporation.
She charges that her deceased husband, about S o’clock on the evening of December 1, 1901, was standing near the southeast corner of the intersection of Ryan and Mills streets, two public throughfares in the city of Lake Charles, and that a slight wind and rain coming up suddenly caused him to seek shelter under the open shed just north of the building occupied by the Lake Charles Carriage & Implement Company, Limited, at the northwest corner of the intersection of said streets; that the darkness being very great while crossing Ryan street in a northwesterly direction, just as he reached the sidewalk on the west side of said street and in front of said building he came in contact with a wire hanging from an electric light pole and lying along the ground, charged with electricity in a careless and negligent manner, and was instantaneously killed thereby; that said wire was a part of the electric light system owned and operated by the defendant, the Lake Charles Ice, Light & Waterworks Company, and the wire which electrocuted her husband was carrying and charged with a current of electricity generated by said company; that it was at that time in a rotten and decayed condition, and was stripped of insulation to such an extent as to leave it practically bare; that said dangerous and defective condition existed throughout the said electric light system—all of which were facts well known to defendant corporation and its agents, servants, and employes at that time and long prior thereto; that said corporation had been and was at that time guilty of tlie^ grossest negligence, and was actively violating its charter and contract with the city of Lake Charles and the ordinances of said city, in that it had constructed and was then operating and maintaining its electric light plant in a careless, improper, and dangerous manner; that said dangerous and defective condition of said wires and system and the gross negligence of the defendant company as set forth were the direct, proximate and sole causes of the death of her husband, and he was not guilty of any act of contributory negligence.
-After so charging, plaintiff made allegations usual to such actions, and prayed for trial bjr jury and judgment.
Defendant answered, pleading, first, the general issue. It admitted that it was the owner of an electric light system in the city of Lake Charles which it maintained and operated, by means of which it supplied both public and private illumination. It averred that its wires were strung by virtue of the terms of its franchise with the city of Lake, Charles, granted in 1891, and its poles located at the direction and under the supervision of the city engineer.
That long after the stringing of its wires at the place designated in plaintiff’s petition the Cumberland Telephone & Telegrax>h Oom-Xiany, in extending its telepihone system in the said city, strung its wires at said point above and over those of defendant.
That on the night in question, at the place mentioned in xflaintiff’s x>etition, one of the wiies was burned in two by coming in contact with a wire of said telephone and telegraph company, which caused the severed ends to fall to the ground. Defendant specially denied that the deceased, Rosalie Hebert, came to his death by electrocution therefrom.
That on the night it was alleged Hebert came to his death there was a severe tornado or cyclonic disturbance in the city oí Lake Charles, which resulted in the loosening and unfastening of a great portion of the wires of the telephone and telegraxih company’s system, one of them falling upon and coming-in contact with the smaller wire of defendant, thereby cutting- it in two; and, if any one was responsible for the alleged death of said Hebert, it was the Cumberland Telegraph & Telephone Company, and not respondent.
Defendant specially denied that its electric system was in the condition mentioned, but, on the contrary, it averred that its wires were new, properly insulated, and in good condition.
It averred that the claim of the plaintiff was inflated and unfounded in law, even *525 should defendant be responsible, as she sought to recover judgment based upon the earning capacity of the deceased on a life expectancy of 40 years, making no allowance for the loss of a day, or for costs of subsistence, illness, or any of the ordinary, usual, and fixed charges of a life, and to that extent plaintiff was endeavoring to enrich herself at the expense of the defendant company; that plaintiff’s claim was extortionate and extravagant, inasmuch as defendant’s plant had been recently valued at $30,000 by an expert.
That defendant’s company officers bore no malice against the deceased, and were not even acquainted with him, and his death, if chargeable to defendant, could not be made the basis for exemplary or punitory damages, which, though not declared upon in plaintiff’s petition; apparently constituted the item of damages asked.
That the night when Hebert came to his death was stormy, dangerous, and tempestuous, and, if he was electrocuted in the manner and form charged—which was specially denied—his death was due to his own contributory negligence in being out in the streets and moving from place to place under dangerous conditions, which contributory negligence defendant pleaded in bar of the action.
The jury returned a verdict in favor of the plaintiff individually for the sum of $4,000 and in her capacity as tutrix for $4,-000.
The court rendered judgment in conformity to the verdict.
After an unsuccessful application for a new trial, defendant appealed.
Opinion.
There can be, in view of the evidence adduced, no contention as to the fact that the deceased, Rosalie Hebert, came to his death by coming in contact with one of the copper wires attached to defendant’s electric plant in the town of Lake Charles, which at the time of his doing so was lying in one of the streets of the town, and charged with electricity generated at defendant’s power house, which was sufficient in strength to kill, and which in fact did kill, him. Such a wire of an electric company, detached from the poles, and lying on the streets of a town, is, of course, out of its proper place, and those having control of it and charged with the legal duty of taking due care of it were bound to account for its being found in that condition and situation. See Maus v. Broderick, 51 La. Ann. 1153, 23 South. 977.
The defendant company was not only charged by general law with the duty of seeing that its wires were so placed and so kept as to injure no one, 'but they were accorded by the town authorities the privilege or right of stringing its wires on its streets irpon the express condition that it should use the utmost precautions in this respect. An examination of the issue in this case must commence with the recognition of an absolute duty on the part of the corporation of protection to the public from things belonging to it or in its custody by due care. The obligation we here refer to is especially emphasized in the ease of the owners of buildings and in a more general manner referred to in articles 666, 667, and 676 of the Civil Code,' and in the legal maxim, “Sic utere.”
Plaintiffs counsel contends that, where an individual or a corporation owns and operates an electrical light plant generating a high current of electricity, conveying it by means of overhead wires along the streets of a town or city, and it is shown that a traveler upon one of the streets came in contact with one of its wires tying upon the sidewalk and was killed thereby, he being without contributory negligence, the burden of proof is upon it to show that the wire was without negligence on its part (res ipsa loquitur); and in support of that proposition they refer the court to Boyd v. Portland Electric Co. (Or.) 66 Pac. 576, 57 L. R. A. 619; Jaggard on Torts (vol. 2) 864; Joyce, Electric Law, § 606; Keasbey, Electric Wires (2d Ed.) § 271; Western Union Telegraph Co. v. State (Md.) 33 Atl. 763, 31 L. R. A. 572, 51 Am. St. Rep. 464; Haynes v. Raleigh Gas Co. (N. C.) 19 S. E. 344, 26 L. R. A. 810, 41 Am. St. Rep. 786; Denver Consol. Electric Co. v. Simpson (Colo. Sup.) 41 Pac. 499, 31 L. R. A. 566; Moran v. Steam Engine Co. (R. I.) 43 Atl. 874, 45 L. R. A. 267; Snyder v. Wheeling Co. (W. Va.) 28 S. E. 733, 39 L. R. A. 499, 64 Am. St. Rep. 922; 21 Am. & Eng. of Law (New Ed.) 512, 513, and notes; Bigelow, Torts, 596; Wharton, Negligence, *527 § 241; Cooley on Torts, 799; Shearman & Redfield, Negligence (5th Ed.) § 60; Clairain v. Telegraph Co., 40 La. Ann. 182, 3 South. 625.
We are of the opinion that this proposition is conservative and correct. The owners of electrical machinery are in a much better position to know and be informed as to its situation, when such a condition of things takes place, than would be an entire stranger to its affairs, who, being lawfully upon the street, should have been injured by its wires.
Defendant insists that it has in this case shown everything in defense which it could be called upon to show. It claims that, if there be legal liability to plaintiff by any one, it is by the Cumberland Telephone Company; that the latter company, when it erected its own poles and strung its wires, found defendant already in position under legal authority, and upon it was imposed the duty of doing everything that should be necessary for the protection of life and property; that it should have strung its wires below that of the defendant, or, if it strung it above them, it should have availed itself of every instrumentality in its power and under its control to guard against the cause of the injury in this case, which it ascribes to the falling of one of the wires of the telephone company upon one of its own and burning it ,so as to make it fall.
Eor the purposes of this case it may be conceded that defendant correctly states the duty of the Cumberland Telephone Company under the circumstances, but it would by no means follow as a legal consequence that the existence of that duty relieved the defendant company from its own duty in the premises.. It should have taken steps itself to relieve the situation from danger, and not have remained inactive simply because some other company had come to have legal obligations to the public imposed upon it. If, after the defendant company placed its poles and strung its wires, new facts or conditions arose, making, in view of them, its first existing status dangerous to the public, it was a mistake on its part to suppose that the changed situation would carry with it no new or increased obligations on its part to the public by way of remedy.
If the situation was such as would have enabled it (defendant) to have forced the Cumberland Telephone Company to perform the duty imposed upon it, it should have made use of its power in that direction, or, failing that, it should have applied some proper remedy itself.
The expert witnesses testify that there was an easy remedy at hand for preventing the wires of the two companies coming in contact with each other at the points of crossing; one of which was to erect an extra pole, known as a “span pole,” at the point of intersection, and attaching the wire or wires to it by placing upon either one of the wires a piece of insulating material known as “waterproofed wood.” Granting that this was exacting on its part more than ought to be called for, the defendant should certainly have placed its own lines in perfect order at the crossing point.
If, as appears from evidence adduced by its own witnesses, the lines of the defendant company below this point had the insulation upon it worn off or taken from it by the dragging by the telephone company of its wires over them in the process of its construction or repairs, the injured lines should have been at once repaired, and not allowed to have remained in that dangerous condition. The wires should have been insulated independently of the cause of the defect or the quarter from which it arose. The fact that there were other lines above their own had the effect of increasing their obligations, not of lessening them. One of defendant’s witnesses (who did not pretend to be an expert, however) testified that the object of insulation was to prevent the escape of electricity, and that it afforded no protection to life. This is in direct opposition to expert testimony in the record, and to Potts v. Shreveport Belt R. R., 110 La. 1, 34 South. 103, where it was stated by this court that the principal object of its use was for that very purpose. If, as the defendant urges, there was danger to its own lines from the presence of the telephone company’s lines above and the danger of their falling, it was gross carelessness on its part to have allowed its wires to have remained just below without insulation as long as it did.
' If the telephone company had a duty to perform, the defendant had one also to perform, and both failed to perform it, and as a consequence of such failure a life was lost. *529 Both corporations were bound in solido, and the fault of one is no excuse for the fault of the other. Defendant seeks to avoid the consequence of its fault by urging that the immediate, direct, and proximate cause of Hebert’s death was a most unusually violent storm, which it had no reason to anticipate, which threw down a wire of the telephone company.
Defendant’s counsel quote from Keasbey on Electric Wires (2d Ed.) § 236, to the following effect:
“When the proximate cause of the injury is an external force for which the company is not responsible, the question of liability will depend on whether the force was one that might have been reasonably anticipated, whether there was not negligence in not having the materials strong enough or sound enough to resist it, and whether the injury was the natural and probable consequence of negligence.
“An electric light company that has erected its poles and wires in the streets of a municipality with the. consent of the proper authorities, is not an absolute insurer against accident therefrom. It is only bound to exercise care and diligence in the erection and maintenance of the system proportionate to the danger, and when it has fulfilled this obligation it has discharged its entire duty, and its liability ceases.”
In support of this position they cite Croswell on Electricity, § 236; Denver Consol. Electric Co. v. Simpson (Colo. Sup.) 41 Pac. 499, 31 L. R. A. 566; Boyd v. Portland Gen. Electric Co. (Or.) 62 Pac. 378, 52 L. R. A. 511.
They quote the Supreme Court of South Carolina as saying in the Mitchell v. Charleston Light & Power Co. Case, 22 S. E. 767, 31 L. R. A. 577, that “a company is charged with so placing its wires as to withstand the ordinary weather—rain, heat, and cold. It is alleged on the part of the company that the wires were broken in consequence of a severe storm. Was it an ordinarily windy day, such as is liable to occur at that time of the year, or was it one that could not be anticipated? The law does not require impossibilities. If a cyclone that could not be anticipated or reasonably be foreseen was the cause of that wire falling, and the company was not negligent in allowing it to remain there for an unreasonable time, then under those circumstances it would not be liable.”
In the case at bar the defendant was in default as to the condition of its wires at the point where the accident took place not only as respects extraordinary storms, but as to events likely to happen at any moment from the simplest causes. It was failing, and had for a long time before failed, to have placed matters in such a condition as was required of it affirmatively to do for the public safety, not only by the general law, but as the condition upon which it had been granted the right or privilege of stringing its wires in the public streets. I-Iad its wires been in fact in such a condition as they were required to be at the time of an extraordinary storm, a different case would have been presented to us. The defendant was not required to take extraordinary precautions to meet possible extraordinary future events, but it was expected, if an extraordinary storm should arise, that its wires would protect the public as far as possible, at least against the effect of the storm. The care and true caution required at the hands of the defendant were not simply the ordinary care of a reasonably prudent man. In the case of Will v. Edison Electric Illuminating Co. the Supreme Court of Pennsylvania laid down as the rule applicable to a company like the defendant making use of such a dangerous agency that it was bound to know not only the extent of the danger, but to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires, and liable to come accidentally or otherwise in contact with them. The defendant (the court said), in accord with the common practice of electric companies, recognizes this obligation by insulating its wires; but the duty was notjonly to make the wires safe by proper insulation, but to keep them so by constant oversight and repairs. 50 Atl. 161, 86 Am. St. Rep. 732. The same view was taken in Mitchell v. Raleigh Elec. Co., 39 S. E. 801, 55 L. R. A. 398, 85 Am. St. Rep. 735, where it was said: “The association [of such a company] was with (apparently) the most inoffensive and harmless piece of mechanism (if wire can be classified as such) in common use. In adhering to the wire, electricity gives no warning or knowledge of its deadly pres *531 ence. Vision cannot detect it. It is without color, motion, or body. Latent, and without sound, it exists, and, being odorless, the only means of its discovery lies in the sense of feeling communicated through the touch, which, as soon as done, becomes its victim. In behalf of human life and the safety of mankind generally, it behooves those who would profit by the use of this subtle and violent element of nature to exercise the greatest degree tof care and constant vigilance in inspecting and maintaining the wires in perfect condition.” To the same effect are the expressions of this court in Potts v. The Shreveport Belt Railway, 110 La. 1, 34 South. 103, and also Joyce on Electricity Law, § 445.
Plaintiff maintains that, if damage is caused by the defendant’s negligence and some other cause for which he is not responsible, including “the act of God,” or superior human force directly intervening, the defendant is nevertheless responsible if his negligence is one of the proximate causes of the damage. Also, where the negligence of a defendant contributes so directly to the plaintiff’s damage that it is reasonably certain that the other cause alone would not have been sufficient to produce it, the defendant is liable, notwithstanding ho may not have anticipated or been bound to anticipate the interference of the superior force, which, concurring with his own negligence, produced the damage; that, negligence of a defendant resulting in damage to the plaintiff having been shown to exist prior to the existence of a storm, the burden is upon it to show that the -damage would have occurred even had there been no negligence on its part; that, to escape liability under a plea of vis major, the defendant must show that it is free from contributory fault.” In support of this position the court is referred to Shearman & Redfield, Negligence (5th Ed.) § 39, and cases there cited; Woodward v. Aborn, 35 Me. 271, 58 Am. Dec. 699; Baltimore & O. R. Co. v. Sulphur Spring, 96 Pa. 65, 42 Am. Rep. 529; Delisle v. Bourriague, 105 La. 77, 29 South. 731, 54 L. R. A. 420.
Granting, in the case at bar, that the storm which occurred on December 1, 1902, at Lake Charles, was of such unusual severity as to have caused most unexpectedly the falling of one of the wires of the telephone company, what would have been the effect of the storm, and the result of such falling, under existing circumstances, had defendant’s wires been insulated? The testimony adduced goes to show that the telephone wire would have laid in contact with defendant’s wire perfectly harmless, and the plaintiff’s intestate would have been alive to-day, but that the telephone wire falling upon defendant’s uninsulated wire burned it almost immediately in two, and instantly killed plaintiff’s husband.
We cannot give, under the existing conditions, to the storm referred to, the defensive force which defendant attaches to it. We think that notwithstanding the storm, and notwithstanding- the falling of the telephone wire, I-Iebert would not have been killed had not at the moment of his death the telephone wire come in contact with a live wire of the defendant company which had been negligently left by it for some time before without proper insulation, and therefore tho defendant company must bear the consequence of not only its negligence, but of its fault. The case was tried by a jury of the vicinage. Their verdict was sustained by the district judge. The jury, the judge, and the attorneys all viewed the place at which the accident occurred, and were in position to apply the evidence to the situation much better than this court could. We would not be justified in setting the verdict aside unless we were satisfied it was clearly wrong; and that we are not.
Defendant urges upon us that the amount of the verdict is too large, and it presents to us for our consideration the fact that the corporation has paid no dividend, and is heavily in debt. The extent of its indebtedness is not disclosed, but the value of its property is shown to exceed $125,000.
The plaintiffs are entitled to be paid from that property, to the extent that they have a legal claim, as fully as any other creditor, and they should not be postponed on account of others. So far as the want of means may have been advanced in extenuation of the failure of the defendant to have placed and kept its wires in legal condition, the position is not well founded. A corporation undertaking to carry on a business as dangerous as that in which the defendant is engaged must be prepared to meet the legal re *533 quirements of the situation from the 'beginning. It cannot be permitted to work its way forward to a safe condition, and in the meantime subject the public to danger to life and limb. The state does not guaranty the stockholders of a corporation that their investment shall be a paying one, nor does it protect a corporation from being forced either by direct authority of the state or indirectly through the execution of judgments of courts to place the property in the condition which safety and the rights of the public demand, even though the effect of so doing will be to cause loss to the parties in interest.
It is entitled to exact justice, with discrimination neither for nor against it.
The deceased was about 21 years of age. He bad been married about 18 months. He left a widow, who, so far as the record shows, is without means of support. She has one child, issue of the marriage, born after the father’s death. The deceased was a man of small means, gaining his livelihood partly by farming upon a small tract of rented land, partly as a laborer in the field. His earnings are shown not to have exceeded $40 per month. He was a man in good health, sober and industrious. His expectancy of life under the mortality tables was 40 years. In addition to want of actual support for the future for herself and child, she has lost the companionship and affection of her husband. The elements which go to fix the quantum of damages in such a case are difficult of ascertainment, but it is none the'less the duty of the court to fix the amount as best it may in the exercise of a sound discretion. The mortality tables are simply an assistance to the court by way of estimate or approximation. They have no absolute probative force. They may properly be referred to by insurance companies in making their contracts, but judgments of court cannot be based absolutely upon them. The earning power of the deceased would have had to be exercised throughout a long number of years, and under numberless contingencies. We think, in consideration of all the facts of this case, that the verdict of the jury was for too large an amount. It should be reduced to the sum of $3,000 in favor of the plaintiff individually and $3,000 in her capacity as tutrix.
For the reasons herein assigned the amount of damages awarded by the jury is hereby reduced to $6,000. The judgment of the court rendered on the verdict is correspondingly reduced to $6,000 as above stated. As so reduced and amended, the judgment appealed from is affirmed, at the costs of the plaintiffs and appellees.