No. 742

First Circuit

LEDET ET AL. v. LOCKPORT POWER & LIGHT CO., INC.

(January 26, 1931. Opinion and Decree.)

Caillouet & Caillouet, of Houma, attorneys for plaintiffs, appellees.

Numa F. Montet, of Thibodaux, and Howell & Deramee, of Lockport, and J. A. O. Coignet, of Thibodaux, attorneys for defendant, appellant.

ELLIOTT, J. Hamilton Ledet and Mrs. Ida Molaison Ledet, his wife, claim of Lockport Light & Power Company, Inc., $10,000 in damages because of the death of their son, Wilton Ledet.

One of the defendant's high-powered wires carrying 2,300 volts of electricity, used by defendant for power and lighting purposes along the highway leading from its plant at Lockport to the Lafourche Crossing, for some reason broke and fell, so that it was hanging on a fence near the ground, close to the highway paralleling Bayou Lafourche.

Plaintiff's son took hold of the wire near the broken end and was instantly killed by the electricity which it carried.

The plaintiffs charge that the breaking of the wire and the death of their son was due to various acts of negligence on the part of the defendant. That the space between the poles was too great, placing too much weight on the wire. That the wire was overloaded, of inferior material, and that same should have been insulated. That a device necessary for the purpose of cutting off the power, in case of a break, rendering the wire harmless, called a "ground detector," necessary for the safety of the public, was not working, and they charge defendant with negligence in that it was not aware of the break for such a length of time after it occurred as to create negligence in itself in that respect.

The petition contains other charges against the defendant, but we do not think the proper decision of the case requires that they be taken into account.

An exception of vagueness, and that plaintiffs' petition was not properly articulated, filed by defendant, overruled in the

lower court, is not urged on appeal, and is therefore not considered.

The defendant for answer denies all the acts of negligence alleged against it by the plaintiffs. Avers that the wire in question was equipped at the time with a proper device for cutting off the power in case of a break. That it maintained a proper inspection, and denied that it was at fault for not having sooner learned of the break.

It alleges that the wire was broken as a result of having been struck by a bolt of lightning. That when it broke it fell on a dry picket fence, and on that account, not having come in contact with the ground, the safety device called the ground detector was thereby prevented from working, and defendant thereby prevented from becoming aware of the break sooner than was received.

That plaintiffs' son knew of the danger resulting from contact with the broken wire; that he had been warned of the danger and advised to let it alone. That in taking hold of the wire he was meddling with it and trespassing, in spite of the warning, losing his life as the result of his own voluntary negligence in doing so.

For written reasons assigned, there was judgment in the lower court in favor of plaintiff for $10,000 as prayed for.

Defendant has appealed.

There is evidence showing that there was some rain, thunder, and lightning during the evening of August 5th, and Mr. Bertrand, superintendent and general manager of defendant, testified that the broken ends of the wire looked like a break that had been caused by lightning; but the decided preponderance of the evidence on the subject is to the effect that the break oc-curred and was observed by a number of people previous to the rain, thunder, and lightning, and therefore could not have been and was not caused by lightning.

The evidence does not point out the particular defect in the matter of the erection or in the quality of the wire to which we can point as the cause of the break. Still it is certain that the break was due to some of the causes alleged by the plaintiffs, res ipsa loquitur.

Defendant's contention that its wire was equipped with a proper safety device for cutting off the power in case of a break, and that it maintained a proper inspection service, is not supported by the evidence.

From between 1 and 2 o'clock p. m. on August 5, 1927, about the time the wire was first observed to be broken, until, say, about 5 o'clock p. m. on August 6, 1927, which was about the time when plaintiffs' son was killed, there elapsed nearly 30 hours, during which period of time the defendant was not aware that its wire had broken and was hanging on a fence near the ground, adjoining the highway in a thickly populated community, charged with a deadly voltage and within reach of anybody who might take hold of it, and along which way grown people and children were passing.

It is not easy to find a good excuse for leaving such a danger, for such a length of time, where it was so likely to be encountered almost every hour of the day it was there.

Defendant contends that the wire accidentally fell on and was held up off the ground by a dry fence. That if the fence had been wet or if the wire had fallen to the ground, the detector would have cut off the current and in that way given it notice of the break.

But a witness whose veracity is not questioned testified that he noticed that the wire was broken the evening of the 5th, but the next morning he discovered that it was resting in his yard partly on a fence, and partly, for a portion of the way, on the ground. That he raised it up off the ground with a stick and put it on the fence. We infer from this that when the wire first broke it fell to and reached the ground, just as this witness found it next morning; consequently defendant's theory that if the broken wire had reached the ground, the grounding would have activated the safety device and cut off the power as soon as it fell, is shown not to be good.

The evidence further shows that during the evening of the day that the wire broke a cow came in contact with it on the fence and was knocked down by the current. The contact with the cow constituted a grounding, and if the safety device had been working the current would have been thereby cut off.

According to the evidence, when plaintiffs' son took hold of the wire, it also constituted a grounding, which, had the detector operated, woud have cut off the power; but defendant received no notice of the break until after news of the death of plaintiffs' son reached the sheriff at Thibodaux, who notified the power plant at Lockport to cut off the power, and which was the first information defendant had that its line was broken, being nearly 30 hours after the break had occurred.

It is therefore established that defendant's wire was not equipped with a safety device, capable of cutting off the power and giving it notice when a break occurred. It is reasonable to conclude that if defendant's wire had been equipped, as should have been done, with an efficient safety device, the life of plaintiff's son would have been saved.

This case comes within the principle of the law which provides that:

"We are responsible, not only for the damage caused by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."

Civil Code, art. 2317. The modifications to which this article is subject have no modifying effect on the responsibility of the defendant for the damage resulting from its neglect in the way stated.

In Myhan & Wife v. Electric Light & Power Co., 41 La. Ann. 964, p. 968, 6 So. 799, 800, 7 L.R.A. 172, 17 Am. St. Rep. 436, the court said, referring to the duty of an electric company to an employee:

"At any rate, it was the duty of the defendant company to have known of the dangerous character and condition of the wires. The knowledge they ought to have had, the law presumes, juris et de jure, they had. Even had the company's representatives sworn that they did not know of the same, such ignorance on their part would not have exculpated them. A superior is presumed to know, and in law knows, that which it is his duty to know, namely, whatever may endanger the person and life of his employee in the discharge of his duties."

Plaintiffs' son was not defendant's employee, but in Potts v. Shreveport Belt R. R. Co., 110 La. 1, 34 So. 103, 105, 98 Am. St. Rep. 452, the court, referring to this language used in the case of Myhan & Wife v. Electric Light & Power Co., had this to say:

"These observations of the Court in the Myhan case apply with more force here by reason of the fact that Potts (the man

killed) sustained no contractual relation with defendant company. He was not in its employ. He was the servant of the Telephone Company, which had the right to be upon the street with its poles and wires and servants in the lawful and legitimate pursuit of its business."

This same reasoning is used in a number of subsequent cases. The courts of this state recognize as the duty of electric companies maintaining high-powered wires in communities where contact may be had with the people engaged in the pursuit of business or pleasure in a legitimate way and in a place where they have a right to be, that of the utmost care consistent with the practical operation of their plant.

In Hebert v. Lake Charles Ice, Light & Waterworks Co., Ltd., 111 La. 522, 35 So. 731, 64 L.R.A. 101, 100 Am. St. Rep. 505, the court maintained this principle in favor of a party who accidentally came into contact with a high-powered wire charged with a heavy voltage, which had broken as the result of a storm and fallen on one of the main streets of Lake Charles.

The court further said, page 525 of Hebert v. Lake Charles Ice, Light & Water Works Co., Ltd., 111 La., 35 So. 731, 732:

"Such a wire of an electric company, detached from the poles, and lying on the streets of a town, is, of course, out of its proper place, and those having control of it and charged with the legal duty of taking due care of it were bound to account for its being found in that condition and situation."

The duty of utmost care and prudence consistent with the practical operation of the plant in situations like the present is supported by the text of Ruling Case Law, vol. 9, subject, Electricity, sec. 13, p. 1200, etc. The doctrine appears to be eminently sound.

The main features of the present situation are very similar to those that existed in Borell v. Cumberland Telegraph & Telephone Co., et al., 133 La. 630, 63 So. 247, L.R.A. 1916D, 1064.

In that case a high-powered wire carrying a powerful voltage was maintained by the city of Crowley. The wire broke at night during a storm. The city of Crowley had installed, for the purpose of safety in case a wire should break, a device known as a "ground detector," evidently the same kind upon which the defendant relied in the present case. The agent of the defendant testified that they had no knowledge of the break, but sent out a man early next morning to find anything that needed looking after. The evidence shows that the ground detector in that case did not work, but the man sent to look after the wire discovered that it had broken, came in contact with it, and was gravely injured. The court said, page 634 of Borell v. Cumberland Telegraph & Telephone Co. et al., 133 La., 63 So. 247, 248:

"The evidence shows that they had no knowledge of it (meaning the break); but if this condition of things had existed so long that it was their legal duty to have had knowledge of it, or if by the use of means which it was the legal duty of the defendant town to have provided but which were not provided they would have had knowledge of it, then the legal situation is as if they had such actual knowledge; or, in other words, the failure to have had such knowledge would then in itself constitute actionable negligence."

In another place in the same decision, the court, referring to the device heretofore mentioned, said, page 635 of Borell v. Cumberland Telegraph & Telephone Co. et al., 133 La., 63 So. 247, 249:

"We think that the clear legal duty rested upon the defendant town to have had this instrument at its plant and to have kept it in good order and to have shut off the current from any circuit, the wires of which were shown by this instrument to be broken. (Authorities.)

"Electrical companies are required to

'have due regard to the existing state of science and of the art in question.'"

Upon a rehearing granted, the first opinion, and from which the above language has been taken, was set aside and plaintiff's demand rejected on the ground that he had been guilty of contributory negligence leading to his injuries; but nothing in the opinion on rehearing indicates that the court was dissatisfied with the language used concerning the duty of an electric company maintaining high-voltage wires to maintain an efficient safety device of the kind mentioned, and that it was in addition further negligence on the part of an electric company maintaining such wires to leave itself without prompt information in a populous community, when a break occurs.

From Ruling Case Law, vol. 9, subject, Electricity, sec. 12, p. 1198, we excerpt the following:

"The proximate cause of an injury has been defined as that, which in a natural and continuous sequence, unbroken by any new independent cause, produces the injury, without which such injury would not have occurred, and in determining the liability of an electric company for a personal injury alleged to have been caused by its negligence, as in other actions for negligent injuries, the generally accepted test is, that negligence is not the proximate cause of an accident unless under all the circumstances the accident might reasonably have been foreseen by a person of ordinary intelligence and prudence, and that it is not enough to prove that the accident is a natural consequence of the negligence; it must also have been the probable consequence."

Then again, section 16, p. 1206:

"This duty of using the necessary skill and prudence to prevent injury to persons coming in contact with their wires, is imposed upon electric companies, not only as regards the public generally, but also with respect to any individual engaged in a lawful occupation in a place where he is entitled to be. Such persons are not trespassers or licensees, bound to take the premises in the condition in which they find them," etc.

In this case it was defendant's duty to have had its wires equipped with an efficient safety device, one that would work, cut off the power and render the wire harmless in case it broke and fell, as it did do, near a frequently used highway and near enough the ground to be taken hold of by children not appreciative of the consequences of doing so.

It was negligence of the gravest kind for the defendant to have left itself without knowledge of the existence of a danger thus created, for the period of time it is shown to have existed before it received notice of the same. Defendant's neglect in the way stated was the proximate cause of the death of plaintiffs' son. The death and plaintiffs' resulting damages is the direct consequence of defendant's neglect in the way mentioned.

Defendant contends that plaintiffs' son had been warned of the danger and was negligent, a meddler and trespasser for having voluntarily and unnecessarily reached inside of the fence and taken hold of its wire. That his death was the result of his own negligence and fault and that plaintiffs have no right to recover on that account.

The evidence shows that plaintiffs' son was about twelve years of age. That he had been going to school and had been promoted to the sixth grade. That the highway along which the wire ran was bordered by a ditch four or five feet wide, but which must have been very shallow.

Between the ditch and the fence there

was a strip of land used as a footwalk, the width of which does not appear, but which, judging from the use which the evidence indicates was made of it, must have been four or five feet wide, maybe wider. Beyond this walk, and as a border to the property line, was the picket fence on which the wire fell and lodged, except in Emile Bourgeois' yard, where a part of it fell to the ground. The wire at the place where plaintiffs' son was killed was lodged on the fence.

It was shown that five boys, one of them plaintiffs' son Wilton, ranging from six to fourteen years of age, had been engaged in play, but were at the time walking along the road returning home. One of the boys, about fourteen years of age, the eldest of the number, testifies that Wilton said to him while they were walking along the road: "Why, it's funny that a bird can stand on that wire and it won't do him nothing." To which the larger boy replied: "I don't know, but I have been told if you touch two it will kill you." Wilton then said: "You think one wire will do something?" To which the elder boy says he replied that it might shock him if he touched it. They went on a little further, getting near where the wire was broken, and Wilton said: "You think that wire would do something?" To which he replied: "Let's leave it alone." The larger boy, after making this last reply, got over the fence and went into an adjoining yard to get a drink of water. Another boy, at the time about the same age as Wilton, then took up the matter, saying, "We were still going and I turned my back to see where the rest was and I saw him (meaning Wilton) when he went in the ditch and caught the wire." That the wire was on top of and about one inch inside the fence; that Wilton went down into the ditch, reached his hand over the fence, and caught hold of the wire about two or three feet from the end, and was instantly killed.

In Ruling Case Law, vol. 9, subject, Electricity, sec. 17, p. 1207 the author, after discussing injuries to trespassers and licensees and stating the rule that there is no liability for negligence where there is no duty of care, takes up in section 18 the rule as applied to children, saying:

"While the general rule as to trespassers or licensees is as just stated, it has often been held that in transmitting electricity, electric companies should especially take into account the thoughtlessness, inexperience, lack of judgment and misjudgment of children of tender years, and in defining the particular duty owing to children, some courts advance the proposition that electric companies are bound to make safe, with respect to their appliances, those places which it knows are attractive to children and where they are in the habit of playing." See also same author, Permanent Supplement, vol. 4, subject, Electricity, same section.

In Mitchell v. I. C. R. Co., 110 La. 630, 34 So. 714, 98 Am. St. Rep. 472, the court held:

"While a boy of twelve years of age may be guilty of contributory negligence which bars recovery, he is not to be held to the same degree of care, prudence and circumspection that a full grown person is."

See also Westerfield et al. v. Levis Bros. et al., 43 La. Ann. 63, 9 So. 52. And Edwin T. Shally v. N. O. P. S. and S. & W. Board, 1 La. App. 770.

In this case plaintiffs' son was on a public road where he had a right to be, and the fact that he, prompted by a venturesome and inquisitive mind natural to his age, reached over the fence, slightly beyond it, and took hold of the broken wire to see what would be the effect, does not justify holding that he appreciated the

danger and was negligent for having taken hold of the wire.

In Clements & Wife v. Electric Light Co., 44 La. Ann. 692, 11 So. 51, 16 L.R.A. 43, 32 Am. St. Rep. 348, and Potts v. Shreveport Belt R. Co., 110 La. 1, 34 So. 103, 98 Am. St. Rep. 452, the court said that:

"Even in the presence of a known danger, to constitute contributory negligence, it must be shown that the plaintiff voluntarily and unnecessarily exposed himself to it."

The remarks of plaintiffs' son to the older boy shows that their son did not appreciate the risk of taking hold of the wire, and as he did not appreciate the risk, he did not know the danger nor voluntarily assume the risk. Consequently his act in taking hold of the wire should not, from a legal standpoint, constitute negligence. Neither did his act in reaching over the fence, a little beyond it, in order to reach the wire, constitute meddling and trespassing.

In the Lapouyade case, 138 La. 237, 70 So. 110, 112, cited by defendant, the boy was seventeen years old, therefore five years older than plaintiffs' son. The court in acting on that case felt that he should be held responsible for his voluntary act, in reaching up and taking hold of an uninsulated wire above the place fixed for handling the contrivance. The wire in that case was also where it had been erected by the New Orleans Railway & Light Company and where it belonged. In this case the broken wire was not where it had been erected, but was in a place where it constituted a deadly danger to children whose thoughtlessness, inexperience, and lack of judgment or misjudgment might prompt them to take hold of it, due to defendant's neglect to install a safety device to cut

off the power, and was left there for an unreasonable length of time.

It seems to us that for us to hold that plaintiffs' son was a meddler and trespasser would be to attribute to him knowledge of the danger, which he did not possess, and that he voluntarily assumed a risk which, owing to his age and inexperience, he did not appreciate. So we do not find that the case cited is a controlling authority in the present case. The court, in fact, said in the case cited:

"A different rule would have had to be applied in this case if the trespass had been so very slight as to have been purely technical; such a one as anybody might be guilty of inadvertently, or even intentionally, on the assumption that no harm could possibly result, and that the owner of the property would certainly not object."

We think this statement can be appropriately applied to the case in hand.

Upon the whole we find that the lower court committed no error in holding that plaintiffs were entitled to recover on account of the death of their son, due to the fault and negligence of the defendant.

The defendant contends that the amount of the judgment is excessive and prays that it be reduced.

We find this to be the case, and after consideration have decided to reduce the amount to $6,000, payable to the father and mother jointly.

The judgment appealed from is therefore reduced from $10,000 to $6,000, and is made payable to the plaintiffs jointly.

And as thus amended the judgment appealed from is affirmed.

Defendant to pay the cost in the lower court. Plaintiffs and appellants the cost of appeal.