KENNON, Justice.
Plaintiffs’ eight year old son, Billy Jean Spillers, lost his life on October 31, 1948, when he grasped a wire hanging down from the high power transmission line of defendant, the Louisiana Power & Light Company. Another son, twelve years old, was severely injured when he attempted to rescue his younger brother. In their petition, plaintiffs alleged that defendant was engaged in the business of manufacturing, transporting and selling electrical power; that one of its high powered lines ran near plaintiffs’ home, located at the intersection of two heavily traveled highways, where there were many other children in the vicinity; that their eight year, old son became attracted to and grasped a wire hanging down from defendant’s high voltage power line to a point close to the ground, and, as a result, sufficient current passed through his body to cause his death. Plaintiffs further alleged that their twelve year old son was seriously injured while endeavoring to extricate his younger brother from the wire.
• The petition further set forth that the high-voltage power line and appurtenances were under the exclusive control of defendant; that the accident would not have occurred if proper care had been exercised by defendant in discovering and correcting the dangerous condition, - and pleaded the doctrine of res ipsa loquitur.
Defendant filed an exception of no cause of action which was referred to the merits, and in answer admitted that it was engaged in the business of transporting electrical power and that one of its lines, carrying a voltage in excess- of seven thousand volts, extended along the right-of-way adjacent to plaintiffs’ premises and the road junction, as alleged by plaintiffs; but denied any responsibility for the tragic death of the one son and the injuries received by the other.
The answer denied that the doctrine of res- ipsa loquitur was applicable; set forth that defendant’s rural electric distribution lines, including the one involved, were constructed in accordance with standards prescribed -by the national bureau of standards of the United States Department of Commerce; that its power line at the point of the accident consisted of two wires spaced vertically some thirty inches apart, the upper of which carries some eight thousand volts of electric current and is attached to the poles at a distance .of twenty-six feet above the gound; that the lower wire is a grounded wire, normally carrying no current, and is attached to the poles some twenty-three and one-half feet above ground; and that the line was equipped with automatic cut-off devices. Defendant denied actual knowledge of the manner in which the electric current was transmitted to the boys involved, but averred that there was found adjacent to the dead boy’s body a piece of ordinary copper wire -long enough to reach its lines and also a rock to which was fastened a short length of the same type of copper wire. The answer further recited that “presumably” either the boys themselves had thrown the rock and attached copper wire over the line, thereby making contact with the electric current, or other parties, in a manner unknown to defend *476 ant, had thrown the wire over and left it hanging in such a way that it could be reached by the boys standing on the ground. Defendant further recited that it had no way of anticipating or preventing the throwing of the wire over its transmission lines, or if the copper wire in question had been thrown across its lines by persons unknown and was hanging free from the line from-early the morning of the accident, as alleged in the petition, defendant had no knowledge of this state of facts,, and asserted that it maintained inspection of its lines in accordance with the practices considered adequate in the electric industry, and that the presence of the copper wire across its line, if such was the fact, was not reported and it therefore had neither actual nor constructive knowledge of its existence.
The District Judge found for the defendant and plaintiffs have appealed.
In this Court, defendant has re-urged its exception of no cause or right of action which was referred to the merits by the District Judge. The language of the petition setting forth the physical, condition which confronted , the boys at the time of the accident is susceptible of an interpretation that leaves serious doubt as to whether a cause of action existed. On the other hand, the paragraphs setting forth the physical set-up and conditions are also susceptible to a reasonable interpretation and would admit evidence that would form the basis for holding the defendant guilty of actionable negligence. Under such circumstances, the exception of no cause of action should not be sustained.
Plaintiffs’.,'home in Ouachita Parish is a short distance from Louisiana Highway No. 15, being located on a community road called -Brownlee Lane, which connects Louisiana Highway 15 with U.. S. Highway No. 80. Near 'the intersection of the Brownlee Lane and Highway 15, a high powered line belonging to defendant runs parallel to and some seventy-five feet from Highway No. 15. The line consists of two strands of insulated copper wire strung som.e two and one-half feet apart vertically and some nine inches apart horizontally, the lower wire being approximately twenty-three feet above the ground. Shortly after noon .on Sunday, October 31, 1948, plaintiffs’ two boys, aged eight and twelve, left their home and went to the vicinity of the road intersection in search of an ax. A short .time later, the elder boy, R. H. S,pillars, Jr., returned to the house alone, in a semi-conscious condition, with severe burns on his left hand and left foot, and minor burns on other portions of his body. The father instituted a search for the younger brother, finding him lying dead under defendant’s power line near the intersection of the two highways. Resuscitation efforts failed. Near the body was found forty to fifty feet of insulated Copper wire of' string-like diameter, which had been burned in two in one or more places. One end of the wire was tied around a small rock. Examination of the wire attached to the rock showed that it had been burned in two, a few inches from the rock itself. Above the scene of this accident, there was a blackened or burned spot on the lower or ground wire of defendant’s line. Otherwise both wires of the power line were in normal place, undamaged and intact.
The only living eye witness to the accident itself was plaintiffs’ injured son, twelve years of age at the time of his injury. His testimony contains the following version of the accident:
“Q. Would you tell the Court exactly what happened on the day on which the accident occurred in which your brother was killed? A. All I remember is we were hunting the ax and he seen that wire and he run and caught a hold of it and I tried to get him off of it.
“Q. Now, when you got to the power line, will you tell the Court exactly what happened? A. We were looking for the ax and I wasn’t noticing him, and I looked down there and he had a hold of that wire and I tried to get him off of.it.
“Q. And then what do you remember after that? A. Nothing.”
His testimony as to whether or not he and his brother had had any wire in pos *477 session that day, before the accident, was somewhat conflicting, as indicated by the following:
“Q. I ask you whether or not you had ever had any wire with you that day before the accident? A. I don’t remember.
“Q. Did you have this wire with you that day before the accident? A.- Never have seen it before.”
The Ouachita Parish coroner found the wire in two pieces, one some forty-five to fifty feet in length, the other just a small piece, one end of which was tied around a rock. He found a small burn on the right hand of the electrocuted boy. ■ The coroner described the wire as “aerial” wire.
The elder Spillars boy testified that he had not seen the wire with the rock attached to it prior to the time his younger brother ran to take hold of it. In contravention of this statement, we have the testimony of a Mr. Tim Bayles, who had occasion to talk with the injured Spillars ■boy shortly after the accident. Mr. Bayles was unacquainted with the Spillars family. It happened that he was driving along the road just after Mr. Spillars discovered the body of his eight year old son. Mr. Spil-lars hailed Mr. Bayles, told him what had occurred and Mr. Bayles, as requested, drove Mr. Spillars back to his home* where the injured boy and the worried mother were awaiting Mr. Spillars’ return. The Bayles car drove up within, a few feet of the Spillars house. Mr. Spillars got out and walked around the car to talk to his wife. Mr. Bayles, - anxious to be of help, asked where the injured boy was, and, being directed into the house, found the boy lying on a cot in a dazed but semiconscious condition. He testified that the injured boy, when asked what had happened, told him that they (presumably the injured boy and his deceased brother) “tied a rock on a wire and threw it over the line.”
In support of their contention that the aerial wire had been placed over the lines by parties other than their sons, plaintiffs introduced the testimony of Mr. Lehman Brown and Mr. Chester McCallum, who unloaded a tractor from a truck near the highway intersection, involved in the present accident, on the Sunday morning in question. , Mr. Brown, stated that he saw “something hanging down” and told Mr. McCallum, the driver of the caterpillar, not to hit it, but that he did not pay “much attention” to it and didn’t “know exactly what it was that was . hanging down.” Mr. McCallum said he turned aside as directed and noticed the hanging object only casual-iy.
Plaintiffs’ witness, Huey Davis, testified that, some three to four weeks 'before the accident, he had had occasion to park his truck near the scene- and said that a group of Negroes sitting there called his attention to something hanging from the power line. He didn’t know whether it was “a string or a wire.” This witness testified that he made no report of seeing the hanging object to defendant' or any other person prior to the accident. He testified that he told Mr. Lehman Brown or Mr. Chester McCallum about seeing this object hanging down “right after the boy got küléd." Mr. McCallum testified that this witness had never mentioned seeing a hanging object to him at all, and Mr. Brown testified that the witness Davis mentioned it to him only on the day of the trial, which occurred more than a year after the accident.
Plaintiffs’ contention that the aerial wire had been hanging over the hot wire and extending almost to the ground for a period of weeks is made the more unlikely in view of the physical set-up of the two wires, and the testimony of the electrical experts that the instant such an aerial wire hanging over the higher hot line should come in contact or close proximity to the ground wire, the heavy voltage would jump to the ground wire and cause a break in the electric system, and doubtless cause the burning in two of the aerial wire. Since the lower or ground wire was nine inches off to the side from the vertical plane extending from the highly charged upper wire to the ground, and only two and one-half or-three feet 'below the .higher wire, it is unlikely that any wire hanging from the higher line would not also touch the lower wire. The fact that such a condition existed is further negated by the proof that *478 the circuit breaking switch and recorder connected with this power line'showed only one interruption in the circuit during the two weeks period including and preceding the date of the accident. Considering the record as a whole, the preponderance of the testimony is that the aerial wire which caused the accident was not hanging from defendant’s line for' any appreciable period of time prior to the accident. Plaintiffs failed to establish that the hanging wire was in position prior to the morning of the accident, and the preponderance of the testimony is that the overhanging wire which caused the fatal accident was not in position over defendant’s line until the afternoon of the accident.
Granting that the aerial wire was seen that Sunday morning by Brown and Mc-Callum and that it was possible — from a technical viewpoint — for it to have swung loose there until the boys came by that afternoon, we consider whether the failure of defendant, to’ discover and remove this danger-breeding foreign object would form a basis for plaintiffs’ recovery. Defendant introduced the testimony of its foreman and line repairman to the effect that they made a habit of observing the rural power lines, including the one with which we are concerned in this cáse, as they traveled along the road in connection with their duties as repairmen and servicemen. Defendant’s officials testified that no “line walkers” as such were used by their company or other companies in checking rural lines of ’ this sort. The manager of the Northeast Louisiana Power Corporation (REA) testified that he was in charge of some eighteen hundred miles of rural electric lines in northeast Louisiana; that his organization maintained no line walkers and relied for inspection upon its normal operating and construction forces, as did defendant. He testifiéd that the service engineer of the REA had never recommended a line walker for distribution lines. He also gave corroborative testimony to that of defendant’s superintendent and workmen that the power line at the scene of the accident was of standard construction with a ground clearance of some ten feet above the height set in the applicable safety code. The superintendent of the electrical plant of the City of Monroe likewise testified that no regular inspection schedule was maintained on the city’s lines, relying as did defendant, upon the employees in the service and maintenance departments, meter readers, etc., to notice or inspect the lines as they pursued their customary duties.
In view of-this proof of the custom and accepted standards in line inspections on rural lines such as the one here involved, and the few hours intervening between the time the wire was assertedly seen across the line by Messrs. Brown and McCallum and the occurrence of the accident, no negligence by the defendant was established in connection with the inspection of its lines or the nondiscovery of any overhanging wire.
We agree with the principle of law set forth in plaintiffs’ brief relative to the duties and responsibilities of those engaged-in 'maintaining electrical wires over which a high voltage of electricity is conveyed. This principle was . recognized by this Court in the recent case of Short v. Central Louisiana Electric Co., Inc., 36 So.2d 658. However, in the case before us, we fail to find proof of any lack of care on the part of defendant in the construction, operation, inspection or maintenance of its electrical system.
The high power line itself would have caused no injury to plaintiffs’ sons except through the medium and agency of the aerial wire. The evidence is plain that this aerial wire which transmitted the high voltage to plaintiffs’ son was no part of defendant’s electrical transmission system. If it was not thrown over the wire by the boys themselves, it was placed there by persons unknown to and unconnected with the defendant.
Plaintiffs have failed to show that the agents of the defendant had anything to do with the placing of the aerial wire across the lines; have failed to show that defendant had any actual notice of the existence of any foreign object across its lines; have failed to show that defendant was guilty of any negligence in regard to *479 inspection of its lines or any circumstances that would justify charging defendant with constructive knowledge of any dangerous condition at the point of the accident.
In view of our conclusion that plaintiffs have not established act of negligence or neglect of duty by defendant with reference to the presence of the aerial wire, or to the construction or inspection of its power lines, or otherwise in connection with the occurrence of the fateful accident, plaintiffs’ case must fail unless recovery is due under the doctrine of res ipsa loquitur. A statement of the essential conditions which must be present for the application of this doctrine are found in 29 Corpus Juris Secundum, Electricity, § 66, pp. 626-627, a portion of which we quote below:
“Conditions essential generally. The conditions ordinarily required for the application of the doctrine of res ipsa loqui-tur must be present before it will be applied in electricity cases. Thus plaintiff must first show the immediate.cause of the injury. Then plaintiff must show, either by direct or circumstantial evidence, the connection between defendant and such immediate cause; he must show that the agency causing the injury was under defendant’s exclusive control and management, and, where an instrumentality or appliance or system of wiring over which defendant has no control and for the proper operation of zvkich he is not responsible intervenes between the. alleged cause and the injury, the doctrine is inapplicable unless it is shown that the accident was due to a dangerous current transmitted to such intervening agency, or, as some authorities have held, unless it is shown that there was no ■ defect in the instrumentality, appliance, or system.
“Further, the circumstances shown must be such as reasonably to exclude any conclusion other than that defendant’s negligence proximately caused the injury; if there is any cause apparent other than defendant’s negligence to which the injury may with equal fairness be attributed, the inference of negligence cannot be drawn. So, where it appears from the evidence that the accident was or may with equal or greater likelihood have been brought about through, the intervention, of a third person or of an irresistible force, the doctrine is inapplicable.” (Emphasis by the Court.)
Under the tests above set forth the doctrine is not applicable to the case before us. The aerial wire and the rock by which means the conducting agent reached the high line and the deadly electricity was carried from defendant’s line and introduced into the bodies of the little victims were not under defendant’s control. This intervening unsafe conductor constituted an essential instrumentality in the chain of events which resulted in the injury. There was no proof or indication that the current in defendant’s line was dangerous to plaintiffs’ children without the intervention of the outside instrumentality.
In the case of Bynum v. City of Monroe, La.App., 171 So. 116, cited by plaintiffs, the Court found the doctrine of res ipsa loquitur applicable, noting, however, that the thing which caused the injury was shown to be under the management of the defendant. The Court further stated that the doctrine would b¿ applicable upon proof of the acts surrounding an injury from contact with live electric wires or appliances when out of proper condition or out of their normal place. In the case before us, the offending wire conducting the electricity from defendant’s line to plaintiffs’ children was not under the management of the defendant nor were their own electric wires shown to be out of proper condition or out of their normal place.
In the case of Hebert v. Lake Charles Ice, Light & Waterworks Co., 111 La, 522, 35 So. 731, 64 L.R.A. 101, where the doctrine was held applicable, the injured party came in contact with one of defendant’s live wires lying upon the sidewalk. Of course, the sidewalk is not the natural or normal place for a .high voltage electric wire.
In the other Louisiana cases cited by plaintiffs, the opinions indicate that the injuries were caused by instrumentalities under the exclusive control of the defend *480 ants. ■ We find no instance in which the doctrine has been held to apply when the injury resulted through an intervening agency (as in the case before us), for which the defendant was not responsible and over which it exercised no control.
Since the doctrine of res ipsa loquitur is not applicable, and there was no proof of negligence on the part of defendant, the judgment rejecting plaintiffs’ demand is correct, and it is affirmed, with costs.