HOOD, Judge
(dissenting).
I cannot agree with the majority in some of the conclusions which have been reached.
In the first place, I do not think the doctrine of res ipsa loquitur can be applied here. The law relating to the applicability of that doctrine has been correctly stated, but I think my conscientious brothers have completely overlooked an important provision of that rule of law, and that is that the doctrine of res ipsa loquitur is not applicable unless “the facts shown suggest the negligence of the defendant, rather than other factors, as the most plausible explanation of the accident.”
In Pilie v. National Food Stores of Louisiana, Inc., 245 La. 276, 158 So.2d 162, our Supreme Court said:
“Accordingly in answer to plaintiffs’ qirestion of law, the facts and circumstances of this case do not permit the application of the doctrine of res ipsa loqui-tur because from them vue cannot draw the inference that it was National’s negligence, rather than the negligence of others, that caused the cartons to fall.” (Emphasis added.)
Justice Sanders, in a concurring opinion handed down in the same case, observed that: “The circumstances shown do not warrant an inference that it was National’s negligence, rather than the acts of others for which National would not be responsible, that caused the cartons to fall. Hence the record does not provide an evidentiary basis for res ipsa loquitur.” (Emphasis added.)
In Talbert v. Tyler, 121 So.2d 854 (La. App. 2d Cir.1960), a case on which the majority relies, our brothers of the Second Circuit held that the doctrine of res ipsa loquitur was not applicable because it could reasonably be concluded that the accident may have been caused by the negligence of another. The court said:
“Nor may the doctrine be invoked where, from the nature of the facts established by the record, it is reasonable to conclude that the fire may have been caused by the negligence of another or through the instrumentality or agency of another.” (Emphasis added.)
In James v. Childs, Division of Kroger Company, 166 So.2d 77 (La.App. 3d Cir. 1964), also relied on by the majority, after quoting from the Pilie case and Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389, we held that the doctrine of res ipsa loquitur was applicable insofar as one of the defendants, Coca Cola Bottling Company, was concerned because:
“The evidence does not shove the reasonable possibility that there was any *343 ether cause for the bottom of the carton giving way than the neglect of this defendant to provide a carton suitable for the purpose of carrying 6 ‘King Size Cokes.’ ” (Emphasis added.)
In the same case we found that the doctrine was not applicable to the other defendant, Childs, because the inference could not be “reasonably drawn” that the accident resulted solely from the negligence of that defendant.
The majority has cited Hebert v. Lake Charles Ice, Light and Waterworks Co., 111 La. 522, 35 So. 731 (1903), and Ledet v. Lockport Light and Power Co., 15 La.App. 426, 132 So. 272 (1st Cir.1931) as two cases involving electric power lines where the doctrine of res ipsa loquitur was applied. In each case there was a brief general statement of the law relating to the doctrine of “res ipsa loquitur,” but the court then proceeded to ignore that doctrine completely and to base its conclusions on specific findings of negligence on the part of the defendants. In the Hebert case, for instance, the court found that the defendant was negligent in maintaining a high voltage wire “without proper insulation.” In the Ledet case, the court found that the defendant was negligent in failing to equip its electric wires with “an efficient safety device, one that would work, cut off the power and render the wire harmless in case it broke and fell.”
These authorities show, I think, that the doctrine of res ipsa loquitur is not applicable unless the circumstances surrounding the occurrence of the accident will warrant an inference that it was the negligence of the defendant, and not the negligence of others, which caused that accident. As stated in the James case, the doctrine is not applicable if there appears to be a “reasonable possibility” that the accident resulted from some cause other than the negligence of the defendant. In my opinion the circumstances shown in the instant suit do not warrant an inference that the accident resulted from the negligence of the defendant power company.
The evidence shows that defendant entered into a contract with Union Cotton Gin in 1957 to supply electrical power to that gin up to a maximum capacity of 30 kilowatts. Pursuant to that contract, defendant installed two transformers and a service line leading from one of its poles to the gin, the transformers and service line having a capacity of more than the maximum demand called for in the contract. The cotton gin was operated for six years thereafter without any difficulty insofar as the supply of electrical power was concerned. In June, 1963, the owners of the cotton gin employed their own electricians to rewire the gin and to install additional motors and electrical equipment, all of which had the result of greatly increasing the amount of electrical power used by that establishment. The electrical work on the gin was completed about September 1, 1963.
Plaintiff was serving as manager of the cotton gin on September 10, 1963. At about 9:30 p. m. on that date he noticed some irregularity in the operation of the motors in the gin, and he proceeded to turn off the main electrical switch. When he did so he received a severe shock which temporarily stunned him. He then went outside the building, and at that time the service line leading from one of defendant’s poles to the cotton gin broke, and there occurred some electrical flashes which he contends caused injury to his eyes.
The defendant power company was notified of this incident shortly after it occurred, and one of its servicemen immediately went to the scene and installed a new and larger service line. The operation of the gin was resumed the following day. On September 12, defendant checked the meter at the gin and found that there had been a substantial increase in the amount of power which was being used. Because of this great increase in the demand for electrical power, defendant replaced the two *344 original transformers with three others, the three new transformers having a greater capacity for supplying electrical current than did the two original ones. Since that time no further difficulty has been encountered insofar as the supply of electrical current to the cotton gin is concerned.
The transformers and the service line leading from defendant’s pole to the cotton gin were under the control of the defendant power company. But, all of the electrical wiring, motors and fixtures in the cotton gin, including the main switch, were owned by and were under the control of the owners of the gin.
Although defendant had contracted to provide electrical power up to a maximum demand of 30 kilowatts, the average demand of the cotton gin for electrical power was slightly greater than that. The records show that prior to the time the rewiring of the gin was completed on September 1, 1963, the greatest demand which had ever been made by the cotton gin for electrical power was 46 kilowatts. The gin was not operating while the electrical repairs were being made in 1963, but it began operating as soon as they were completed, and due to the additional electrical motors and equipment which had been installed, its use of electricity was increased considerably when operations were resumed on September 1, 1963. The meter reading shows that during the fifteen-day period which ended on September 12, 1963, and which included the day of the accident, there was an average demand at the cotton gin of 68 kilowatts, or an average of almost one and one-half times the greatest demand which had ever been made before.
Prior to the date on which the accident occurred, the defendant power company had not been informed that the cotton gin intended to increase its use of electrical power. It had no knowledge of the fact that there would be or had been such an increase until it checked the meter two days after the accident, and it discovered at that time that there had been a substantial increase in the use of power during the preceding fifteen-day period.
There is nothing in the evidence which suggests that there was any defect in the transformers supplied by defendant. The only part of the defendant’s equipment which failed was the supply line leading to the gin, which line broke and burned. The only possible explanations which have been offered as to why this occurred are: (1) That the line was so defective that it simply broke and burned; (2) that shortly before the accident happened the cotton gin placed on the line a heavier load than it was capable of carrying; or (3) that there was some defect in the wiring inside the gin, evidenced by the severe shock which plaintiff received when he touched the switch in that establishment, and that this defective wiring caused the line to become suddenly overloaded and to burn. The evidence shows that the defendant inspected this line on August 19, 1963, just a few days before this accident occurred, and found it to be in good condition. It also shows that the service line was adequate to carry considerably more electric power than the maximum amount called for by the contract or the maximum amount which the cotton gin had ever used before, that defendant was ready and willing at all times to increase the size of its transformers or service lines at any time it was informed or became aware of the fact that such an increase was needed, and that defendant knew nothing of the cotton gin’s intent to increase its demand prior to or at the time of the accident.
Plaintiff’s own testimony shows that on the day the accident occurred, there was a serious defect in the electrical wiring of the cotton gin, since plaintiff received a severe shock when he attempted to pull a switch. This defect in the wiring could have caused the service line to be suddenly overloaded and to break. The defendant, of course, had nothing to do with the wiring in the gin, and it cannot be held responsible for the defect which caused *345 the plaintiff to receive a severe shock when he attempted to pull a switch in the gin.
I think the evidence shows beyond any question that there was no defect in a,ny of the transformers or in the service line which ran from defendant’s post to the cotton gin. The evidence also establishes clearly that the sole and only cause of the break in the line was either the obvious defect in the wiring of the gin, or the sudden and substantial increase in the demand of the gin for electric power. The defendant had no control over the defective wiring, and it was not informed and had no knowledge of the fact that the gin intended to increase its demands of electric power. The most likely and probable cause of the accident was the negligence of the cotton gin in failing to rewire its building properly or in failing to inform the defendant of the fact that it would greatly increase its demand for electric power.
Since the circumstances surrounding the occurrence of this accident do not warrant an inference that it was caused by defendant’s negligence, rather than the acts of the operators of the cotton gin, I feel that the doctrine of res ipsa loquitur cannot be applied here.
Even if the doctrine of res ipsa loquitur should be applied, I think that the evidence produced by the defendant more than amply meets the burden of proof which is shifted to it, and it completely absolves the defendant from any negligence.
I also disagree with the majority in their conclusion that the eye injury which plaintiff sustained was the result of the breaking and burning of the service line. Plaintiff was at least 26 feet from the wire when it burned, and the flashes occurred only momentarily. Only a few hours before the accident occurred, however, plaintiff had been in the immediate vicinity of some welding which was being done in the cotton gin. He, in fact, assisted the welder by holding some of the iron which was being welded, and while doing so he was within three feet of the welding arc. He did not wear goggles or any other device to protect his eyes from the damaging light of the welding arc. tie was warned by an employee of the gin that he would injure his eyes if he remained in such close proximity to the welding without some protection to his eyes, but he did not heed this warning. Neither of the two doctors who treated plaintiff had ever seen a flash burn caused by the burning of an electrical wire, but both have seen and treated many cases where such burns occurred from welding arcs. The medical testimony shows that after receiving a flash burn, the injured person ordinarily does not realize that he has sustained such an injury until several hours after it has occurred. In this case, plaintiff first noticed that he had an eye injury at 2:00 a. m. the following day, which fact is consistent with the position taken by defendant that the injury resulted from the welding procedure and not from the burning of the service line.
In my opinion, the evidence clearly preponderates that the flash burn which plaintiff sustained resulted from his close proximity to the welding arc, and not from the burning of the service line. The defendant, of course, had no control over and was not in any way connected with the welding work which was being done at the cotton gin that day.
Finally, if we should assume that defendant was negligent and that plaintiff did sustain a flash burn as a result of the breaking of the service line leading to the cotton gin, then I feel that the award is excessive. Plaintiff’s treating physician referred him to an eye specialist who examined plaintiff on September 25, 1963, fifteen days after the accident occurred. This specialist testified that at that time plaintiff had completely recovered from any injury which he may have received fifteen days earlier, that he had 20/20 vision at that time, and that there was no residual injury or disability from the accident. He further testified that such in *346 jury “usually will heal in less than five days.” He received only a minimum amount of medical treatment, and that was simply for the electric shock which he received. .As I have already pointed out, the electric shock was not caused by any negligence of the defendant. In my opinion an award of $2500 for pain, suffering and medical bills is excessive, and is all out of proportion to awards made in other similar cases.
The evidence does not show any loss of income at all, and thus I cannot consent to an award for that claimed item of damages.
For the reasons assigned, I respectfully dissent.
On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., and SAVOY, J., are of the opinion that a rehearing should be granted.